391 A.2d 595

Milton J. SHAPP, Governor, et al., Appellants,

v.

Grace M. SLOAN, State Treasurer, and the General Assembly
of the Commonwealth of Pennsylvania (two cases).

Milton J. SHAPP, Governor, et al.

v.

Grace M. SLOAN, State Treasurer, and the General Assembly
of the Commonwealth of Pennsylvania, Appellants.

Supreme Court of Pennsylvania.

Argued Jan. 20, 1977.

Decided July 19, 1978.

452

Duane, Morris & Heckscher, Henry T. Reath, Roland Morris, Hugh M. Emory, Philadelphia, for appellants at No. 586.

James M. Marsh, Vincent X. Yakowicz, Sol. Gen., Harrisburg, for appellees at No. 586.

Melvin R. Shuster, Deputy Atty. Gen., J. Justin Blewitt, Jr., Deputy Atty. Gen., Chief, Civil Litigation, Vincent X. Yakowicz, Sol. Gen., Robert P. Kane, Atty. Gen., for appellants at Nos. 4 and 214.

James M. Marsh, Deputy State Treasurer and Chief Counsel, Harrisburg, Duane, Morris & Heckscher, Roland Morris, Philadelphia, for appellees at Nos. 4 and 214.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

458

## OPINION

MANDERINO, Justice.

On July 7, 1976, the Governor of Pennsylvania, various cabinet officers and the Governor's Justice Commission—appellants in this case—filed a petition for review directed against the State Treasurer challenging the constitutionality of Acts 117 and 17–A of 1975. They sought a declaratory judgment holding these acts to be null and void, and a writ of mandamus and injunctive relief to compel the State Treasurer to honor requisitions properly presented for federal funds allocated to State agencies pursuant to Acts of Congress. The Governor, Attorney General and the Justice Commission asked also for a preliminary injunction to enjoin the State Treasurer from refusing to honor requisitions for payment of federal funds to the Department of Justice for salaries and operating expenses incurred by the Office of the Special Prosecutor. The General Assembly was granted permission to intervene as a respondent.

After a hearing on the request for the preliminary injunction seeking release of the Special Prosecutor's funds, the Commonwealth Court entered an order dated July 15, 1976, denying the injunction as sought but granting an injunction directing the Treasurer to issue her warrant for payment of expenses already incurred, up to the amount of federal funds allocated to that office by the Law Enforcement Assistance Administration (LEAA) through June 30, 1976 and still unexpended. This Court denied a stay of that order. The parties are now before us on cross-appeal from this order of July 15, 1976.

Appellants are also appealing from the final order of the Commonwealth Court entered on December 3, 1976, granting the State Treasurer's and General Assembly's motions for summary judgment and dismissing appellants' motions for partial summary judgment and modification of order.

From 1961 to 1975, the annual appropriations acts of the General Assembly contained a general provision appropriating grants made to the Commonwealth for various federally

funded programs to the State agency involved in the programs' administration. The provision in the General Appropriations Act of 1975 was typical of these general allocations:

"In addition to the amounts appropriated by this act, all moneys received from the Federal Government, or from any other source as contributions for the programs provided herein, or as payment for services or materials furnished by one institution to another, except those collections designated as revenues, *shall be paid into the General Fund and are hereby appropriated out of the General Fund* for the purposes of the respective appropriations." (Emphasis added.)

General Appropriations Act of 1975, 1975 Act No. 8–A, § 8(b).

Although many of these General Appropriations Acts also appropriated funds for some specific programs, legislative control over the funds was, in the General Assembly's own terms, "minimal." At most, the General Assembly's actual control consisted of authorizing applications for particular federal programs and placing conditions or restrictions upon application for federal funds. The legislature did, of course, maintain exclusive control over appropriations of State matching funds and general revenue sharing.

Despite the minimal control exercised in the yearly Appropriations Acts, it is to be noted that for more than a decade the Acts clearly and unambiguously placed such federal funds into the State's General Fund, apparently without objection from the Executive.

By 1975, federal aid programs had been increasingly implemented in Pennsylvania, and federal funds accounted for approximately 25% of the total resources of the Commonwealth. The General Assembly accordingly decided to exercise over such federal funds the full control which it considers its constitutional responsibility as the branch of government entrusted with control of the state's finances.

Therefore, on June 29, 1976, following extensive study and hearings, the General Assembly enacted Act 117 over the Governor's veto. The text is as follows:

"§ 4611. Requisitions on state treasury; indicating federal funds requested

Any person authorized by law to issue requisitions for the payment of moneys from the State Treasury shall, when submitting any such requisition to the State Treasury, indicate thereon whether any of the funds so requested were derived, in whole or in part, from Federal funds.

§ 4612. Requisitions on state treasury; indicating requested funds as matching funds to federal funds

Any person authorized by law to issue requisitions for the payment of moneys from the State Treasury shall, when submitting any such requisition to the State Treasurer, indicate thereon whether any of the funds so requested will be used, directly or indirectly, as matching funds to Federal funds.

§ 4613. Warrants for requisitioned federal funds; specific appropriations by act of General Assembly

The State Treasurer is hereby specifically prohibited from issuing any warrant for requisitioned funds which were derived, in whole or in part, from Federal funds unless such funds have been specifically appropriated by an act of the General Assembly.

§ 4614. Warrants for requisitioned funds used as matching funds to federal funds; specific appropriation by act of General Assembly

The State Treasurer is hereby specifically prohibited from issuing any warrants for requisitioned funds which will be used, directly or indirectly, as matching funds to Federal funds unless such Federal funds have been specifically appropriated by an act of the General Assembly.

§ 4615. Deposit of funds; credit to general fund account; exception

Except as may be hereinafter provided in this section, no Federal funds, whether designated as grants, augmen-

tations, credits or otherwise, received from the Federal Government in any fiscal year shall, by executive order of the Governor or by any other executive action, be deposited in or designated as a special or restricted fund account, separate and distinct from the General Fund account. All such federal funds shall be deposited in and credited to the General Fund account, be contained in the budget as hereinafter provided, and be available for appropriation by the General Assembly as part of its operating budget, except that such federal funds need not be deposited in nor disbursed by appropriation from the General Fund account under the following limited statutory circumstances. If the General Assembly has by statutory enactment created a special fund or restricted receipt account and has specifically provided therein for an exclusive, special purpose or purposes for which Federal funds deposited in such special fund or restricted receipt account can only be used, then under such statutory circumstances, Federal funds received which are specifically and exclusively ear-marked for such General Assembly determined special fund or restricted receipt purpose or purposes may be deposited in such statutorily created special fund or restricted receipt account. And, without further statutory appropriation being required, can be used solely and exclusively for such specific statutory special fund or restricted receipt purpose or purposes. But, under no circumstances shall Federal funds received and deposited in such statutorily created special fund or restricted receipt account be disbursed by executive order of the Governor or by any other executive action for any purpose or purposes not specifically prescribed by the statute which created said special or restricted receipt account, except by appropriation made by law during the fiscal year in which such funds were received.

§ 4616. Preparation of state budget estimates; inclusion of federal funds received or anticipated; legislative intent

462

Notwithstanding anything in any law to the contrary, it shall be the duty of the Secretary of Revenue when submitting to the Budget Secretary and to the Governor his officially certified estimate of revenues and receipts from any and all sources for use in the preparation of the Governor's proposed budget for the ensuing fiscal year to specifically include therein an estimate of any and all funds received or anticipated to be received from the Federal Government whether such funds are designated as grants, augmentations, credits or otherwise, together with the purposes for which such funds, as aforesaid, are provided or to be provided. The Secretary of Revenue shall provide a Federal funds estimate to the Governor for use by the Governor in signing any appropriation bill.

The General Assembly hereby declares its legislative intent not to enact any operating budget for any fiscal year unless and until a budget is submitted in accordance with the provisions of this act.

§ 4617. Law[s] governing

Notwithstanding any other law or portion of any other law including section 3 of the act of December 27, 1933 (Sp.Sess. 1933–34, P.L. 113, No. 29), entitled 'An act authorizing the State Treasurer to act as custodian of moneys and securities contributed to or deposited with the Commonwealth, or officers, departments, boards or commissions of the Commonwealth; prescribing the manner in which such moneys or securities shall be held and disbursed or delivered up; and making an appropriation to the Treasury Department for the cost of administering such moneys and securities,' the provisions of this act shall prevail."

1976, P.L. 469, No. 117, 72 P.S. § 4611, et seq.

In essence, Act 117 mandates that all federal funds be deposited in the General Fund without designation as a restricted or separate account, and that they be available for appropriation by the General Assembly, (§ 5, 72 P.S. § 4615). The State Treasurer is prohibited from paying out any such federal funds unless pursuant to a specific appropriation by the General Assembly. (§ 3, 72 P.S. § 4613).

Act 17–A of 1976, also in issue, is the Federal Augmentation Appropriation Act of 1976, implementing Act 117 by making the line appropriations of federal monies to the intended programs.

This controversy arose when the State Treasurer refused, in the absence of an appropriation, to disperse to the Justice Department for the office of the Special Prosecutor monies allocated to Pennsylvania by the Law Enforcement Assistance Administration (LEAA).

Appellants urge us to consider numerous arguments in support of their position, bolstered in a voluminous brief by contentions both of policy and of constitutional interpretation. Nevertheless, the conflict revolves around one basic question—the validity of Acts 117 and 17–A of 1976 under the Pennsylvania and the United States Constitutions. If the Acts in issue were constitutionally enacted, the State Treasurer was mandated by law to refuse payment of monies for which no appropriation had been made.

The appropriations power in this Commonwealth is vested in the General Assembly by Article III, Section 24 of the Pennsylvania Constitution, which provides that:

"[N]o money shall be paid out of the treasury, except on *appropriations made by law* . . . but cash refunds of taxes, licenses, fees, and other charges paid or collected, but not legally due, may be paid, as provided by law, without appropriation from the fund into which they were paid on warrant of the proper officer." (Emphasis added.)

Inasmuch as Article II of the Pennsylvania Constitution gives to the General Assembly the legislative power of the Commonwealth, the above section 24 of Article III requires legislative action before money can be paid out of the treasury.

The appellants argue, however, that Acts 117 and 17–A are not constitutional exercises of the General Assembly's Article III, Section 24 power to make appropriations for funds in the state treasury. They contend that legislative authority over state funds *does not extend to federal*

funds, and that the Acts therefore unconstitutionally expand the state legislative power. In insisting that the General Assembly's paramount power over state funds does not extend to funds "not raised under state law," appellants offer a plethora of sub-arguments to show that the Executive, rather than the legislature, has the power to control expenditure of funds which the federal government has committed to state executive officers and agencies. Thus, their argument is two-pronged: the Legislature has exceeded its Constitutional power by assuming to control funds not legally at its disposal; and in doing so, has encroached upon the rightful sphere of the executive in violation of the doctrine of Separation of Powers embodied in our Constitution.

In reviewing the constitutionality of a legislative enactment our inquiry is directed only to whether a specific constitutional prohibition has been transgressed. *Commonwealth v. Sutley*, 474 Pa. 256, 378 A.2d 780 (1977). We are bound both by statute and by more than a century of case law to honor a strong presumption in favor of the constitutionality of a statute. *Commonwealth v. Sutley, supra*; *School Districts of Deer Lake and Allegheny Valley v. Kane*, 463 Pa. 554, 345 A.2d 658 (1975); *Commonwealth ex rel. Schnader v. Liveright*, 308 Pa. 35, 161 A. 697 (1932); *Sharpless v. Mayor of Philadelphia*, 21 Pa. 147 (1853).

If the legislation has been duly enacted by the General Assembly and is within the scope of legislative power, the challengers bear the heavy burden of proving beyond a reasonable doubt that it "clearly, palpably and plainly" violates the Constitution. *Commonwealth v. Sutley, supra; Tosto v. Pennsylvania Nursing Home Agency*, 460 Pa. 1, 331 A.2d 198 (1975); *Commonwealth ex rel Schnader v. Liveright*, 308 Pa. 35, 161 A. 697 (1932).

There are no allegations here of irregularity in the enactment process. Appellants must therefore prove to us that the Acts were clearly and palpably outside the scope of the legislative powers vested in the General Assembly by Arti-

cles II and III of the Constitution or that, even if within the scope of legislative power, other Constitutional prohibitions have been violated by their enactment.

Appellants have failed to prove their basic premise that funds not raised under general state law are constitutionally differentiated from other funds in the State Treasury, and thus constitutionally beyond the scope of the General Assembly's authority. We can find no legal basis for the assumption that federal funds are not subject to the General Assembly's Article III, Section 24 appropriation power.

The only funds excepted from our constitution's mandate that expenditures from the Treasury be made only if pursuant to legislative appropriation are referred to in the second clause of Article III, Section 24 itself: "Cash refunds of taxes, licenses, fees, and other charges paid or collected, but not legally due." This clause cannot be stretched, as appellants would have us believe, to "signify the Framers' intent to dispense with the necessities of an appropriation of monies in the State Treasury not raised under State law." Rather, the clause applies to the narrow situation where refund of an overpayment must be made. It simply authorizes the refund of overpayments without appropriation. When the Commonwealth has acquired monies through error they are unavailable for spending by *any* branch of the government, and their return is no more than the correction of a mistake. The framers of our Constitution explicitly excepted from the appropriations provision monies which could not legally be used by the Commonwealth for any purpose. Had they contemplated any exceptions as to funds which *are* legally available for governmental concerns, it follows that these would also have been specified. No other limitation or modifications are contained, however, in Article III, Section 24. The framers gave to the General Assembly the exclusive power to pay money out of the state treasury without regard to the source of the funds. In contrast, nowhere in our Constitution is the executive branch given any right or authority to appropriate public monies for any purpose.

Appellants' reliance upon *Commonwealth v. Perkins,* 41 Pa.D. & C. 55 (C.P.Dauph.1941), aff'd 342 Pa. 529, 21 A.2d 45 (per curiam), aff'd 314 U.S. 586, 62 S.Ct. 484, 86 L.Ed. 743 (1942) (per curiam) is misplaced. Their argument that appropriation is necessary only for funds raised pursuant to state law is based upon the following definition of "appropriation":

"As we understand the word 'appropriation', when used in the constitutional or legislative sense, it means a designation of money raised by taxation to be withdrawn from the public treasury for a specifically designated purpose."

41 D. & C. at 62, cited at 342 Pa. 532, 21 A.2d at 48. Appellants admit that funds derived from other, non-tax sources are also subject to appropriation from the general fund by the General Assembly but insist that the words can be read no more liberally than to include non-tax revenues from in-state sources such as fees, rentals and escheats. The thrust of this portion of the *Perkins* opinion was not to delineate all possible sources of public funds, but to define the term "appropriation." The number of sources of revenue for the state has always been limited. The *Perkins* court also said that "[t]he State has no power to take the property of a citizen except, by way of taxes or eminent domain." (Citation omitted.) *Perkins, supra,* 342 Pa. at 531, 21 A.2d at 47. Thus, it is not surprising that the Court's contemplation of public funds available for State spending appeared to be limited to money raised by taxation. The Court in 1941 could not anticipate that another source of income would become available for wide-spread administration of programs on the State level, and that within three decades, federal funds would constitute a large portion of the budgets of most states in the union.

Whereas, in 1954, more than a decade after *Perkins,* total federal aid to all state governments was $2.9 billion, it was more than $60 billion in 1976. *Information Bulletin,* No. 76–4, p. 1, Advisory Commission on Intergovernmental Relations (Nov. 1976). In an age when state funds were provided almost entirely through state taxation, the *Perkins* court

had no reason to foresee the vast impact that federal funding would eventually have on state fiscal matters. To interpret its choice of words as excluding such federal funds from state monies available for appropriation is as illogical as to exclude regulation of air traffic from the Congress' constitutional Commerce Clause powers because not mentioned or contemplated by the framers.

The same defect is apparent in appellants' reliance upon other cases which they insist support their limited definition of monies subject to appropriation as only those raised pursuant to state law. They have seized on cases containing chance definitions of appropriations written to solve problems entirely unrelated to the purposes of this appeal and drafted without contemplation of federal monies as a major source of state funding. The constitution says "no money" shall be paid without an appropriation. We think the constitution means exactly what it says.

The cases relied on from foreign jurisdictions likewise fail to convince us that the legislative power of appropriation does not extend to federal funds. For example, in neither *Navajo Tribe v. Arizona Department of Administration,* 111 Ariz. 279, 528 P.2d 623 (1975) nor *Sego v. Kirkpatrick,* 86 N.M. 359, 524 P.2d 975 (1974), cited by appellants, were the grantees either officials or agencies of the state government. Neither case, then, is in point in deciding how federal funds granted directly to a state, through an agency or official of the state, shall be dispersed.

██ Appellants cite *MacManus v. Love,* 179 Colo. 218, 499 P.2d 609 (1972), a Colorado case, contending that federal funds received in that state may be expended by the executive branch without legislative approval. We find its reasoning completely unpersuasive. Appellants argue that the executive branch is entitled to use federal funds without legislative approval because the executive branch, or one of its officials or agencies, is the nominal recipient charged with the responsibility for administering the programs for which the funds were received. Accordingly, argue the appellants, the State Treasurer is only the custodian of the

funds. That funds are designated custodial funds does not mean that legislative action approving the use of the funds is not needed. *Commonwealth v. Dollar Savings Bank*, 259 Pa. 138, 102 A. 569 (1917); *Commonwealth ex rel. Bell v. Powell*, 249 Pa. 144, 94 A. 746 (1915).

██ The funds which Pennsylvania receives from the federal government do not belong to officers or agencies of the executive branch. They belong to the Commonwealth. The agency or official who is authorized to apply for federal funds does so only *on behalf of* the Commonwealth. The federal grants are made to the *state,* not to a single branch of state government. See, for example, the Omnibus Crime Control and Safe Streets Act of 1968, P.L. 90–351, 82 Stat. 197, *as amended,* 42 U.S.C. 3701 et seq. (1970 and Supp.1978), which throughout its provisions makes clear that grants are to "States" (or "State and local governments"), and nowhere indicates that grants are to be made to a single branch of the state government. Appellants have cited nothing which dictates that the federal laws pursuant to which these programs are funded requires that the Pennsylvania legislature is to be by-passed.

As pointed out earlier, twenty-five percent of Pennsylvania's budget is now derived from federal funds. The logical result of appellants' argument—if the percentage were, as an example, to reach one hundred percent—would be to eliminate the need for a legislative branch of government. The federal government could simply supply federal monies to the executive branch which would proceed to administer the revenue without appropriation of any of the monies by the legislature.

 It is fundamental within Pennsylvania's tripartite system that the General Assembly enacts the legislation establishing those programs which the state provides for its citizens and appropriates the funds necessary for their operation. The executive branch implements the legislation by administering the programs. *See, e. g., Stander v. Kelley,* 433 Pa. 406, 250 A.2d 474 (1969). It must do so within the

requirements and restrictions of the relevant legislation, and within the amount appropriated by the legislature. The executive branch may not of its own initiative use funds appropriated for one program in carrying out another and may not spend on a program more than its designated amount. It is in this way that the doctrine of separation of powers functions.

Nothing in the federal legislation pursuant to which these funds are granted suggests that the same principles by which programs wholly state funded are operated are inapplicable to programs for which federal funds are supplied. That the executive agency or official must use federal monies within the program for which they were intended, and must provide an accounting to show that they were so used, does not lead to the conclusion that the funds are under that official's control and outside the control of the legislature. No one would suggest such a conclusion as to programs wholly initiated by the Commonwealth itself.

The programs for which these federal funds are received are intended by Congress for administration on the state level, and cover matters traditionally of state concern, such as education, law enforcement and public welfare. It is the General Assembly, not the executive branch, which has been given the constitutional power to determine what programs will be adopted in our Commonwealth and how they will be financed. Although this may be done upon the recommendations of the executive branch, the final determinations are legislative in nature. The executive's function is to carry out those programs authorized by legislation.

To hold that the Executive has control of these federal funds would permit a dual system which would result in duplication of services and obliteration of the distinctions between the separate functions and powers of these two co-equal branches of government. It would, for example, enable the Governor to use federal funds to establish and finance one system of agencies for law enforcement or education without the approval or authorization of the very body which is constitutionally empowered to set up and

finance state plans for education or law enforcement. With a large portion of the state budget now provided by federal funding, the executive branch could well end up with as much legislative responsibility as the General Assembly itself. It is *that* result which we feel would "clearly and palpably" violate the doctrine of separation of powers embodied in our Constitution. The fullest efficiency can be achieved only through proper integration and coordination of all programs administered on the state level, be they federally funded, state funded or funded by matching funds. This is most logically achieved if the General Assembly retains its fiscal control while the legislature functions to put the programs into practice.

Appellants seem to fear that legislative fiscal control over federal funds amounts to legislative seizure for its own purposes. The Legislature is not free to use arbitrarily those funds which the Commonwealth has accepted pursuant to agreement with the federal government. The federal government may impose conditions and limitations upon the monies it allocates to the states and the General Assembly must stay within those guidelines or refuse the grant. Within each grant, however, there remains the necessity to establish spending priorities and to allocate the available monies. This is properly a legislative function.

Appellants have reiterated throughout their brief that it is federal policy to allow state governments as much control as possible over these federally funded programs. It cannot, therefore, be considered an encroachment upon federal supremacy that the legislature, rather than the executive, exercises the discretion granted the state government by the Congress.

We note that at least one federal committee involved with this problem has determined that state legislative control over federal funds does not contravene federal policy and is, in fact, the desirable mode of administration. The Advisory Commission on Intergovernmental Relations (ACIR), a permanent committee created by the United States Congress in 1959 to monitor the operation of the American federal

471

system and recommend improvements, has urged state legislatures to assume greater control of federal funds coming into state governments.

In its Bulletin 76–4 of November, 1976 referred to *supra*, the commission recommended that state legislatures include all federal aid in appropriation bills, prohibit spending of federal funds over the amount appropriated by the legislature, and establish spending priorities by making the line appropriations within the program allocations. In explaining the rationale behind its recommendations, the Commission noted that the states have been accorded much more discretion in the administration of federal funds since the late 1960's, and that there has also been a sharp increase in the amounts of federal aid granted to the states. These factors suggest the need for legislative involvement in the decisions relating to the uses of these funds.

At the time of the publication of Bulletin 76–4, the ACIR was drafting model legislation for use by state legislatures intending to become more involved in the appropriating of federal funds. In more than a year and a half which has passed since the ACIR first made its recommendations in August, 1976, we have received no indication that Congress has in any way disapproved its committee's actions in advising state legislatures to increase their role in the spending of federal monies. There is no evidence before us to indicate that Congress considers such state legislative involvement an encroachment upon the supremacy of the federal government.

█ A duly enacted state law will not be found to violate the Supremacy Clause of the United States Constitution unless the state law and the federal law are so inconsistent that they cannot be reconciled or constructed in such a way as to permit both to stand. *See California Equalization v. Goggin,* 191 F.2d 726 (9th Cir. 1951), *cert. denied,* 342 U.S. 909, 72 S.Ct. 302, 96 L.Ed. 680 (1952); *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943); *Missouri, Kansas & Texas Railway Co. v. Haber,* 169 U.S. 613, 18 S.Ct. 488, 42 L.Ed. 878 (1898).

472

■■■■■■ We do not find the clear and direct conflict necessary to invalidate a state law under the Supremacy Clause, and must therefore reject appellants' second contention. The federal legislation in question encourages state control of these programs. As long as the funds are not diverted from their intended purposes and the terms and conditions proscribed by the Congress are not violated, there is no inconsistency between the provisions of the federal programs and state legislative administration of the funds. The federal government has expressly given the states a wide discretion in dealing with these funds. That discretion is most logically exercised by the branch of state government which is constitutionally empowered to exercise control over *all* expenditures.

■■■■■■ Appellant's third Constitutional argument against Acts 117 and 17–A is that they impair contractual obligations between the Commonwealth and the federal government and between the Commonwealth and its sub-grantees, in violation of the contracts clauses of both the United States and Pennsylvania Constitutions.

As to the alleged impairment of contract rights between the federal government and the Commonwealth, we agree with appellees that these grants are not contractual in nature, but are better classified as conditional gifts. The funds are granted to the state subject to compliance with certain conditions. Once granted, the discretion for their use within the intended program is generally left to the state. State participation is wholly voluntary. Likewise, the federal government offers the funds of its own volition; it is doubtful that a state could compel the federal government to provide such funds for its use. The federal funding system is, in essence, one of a voluntary cooperative effort between two governments to provide needed services for their citizens. The federal government supplies funding, while the state government plans and administers the programs. This cooperative venture is not based upon those rights and duties of an obligatory nature, enforceable in a court of law, which characterize a contractual relationship.

The agreements with the federal government pursuant to which these funds were granted, even if they were to be considered contracts, are not impaired as long as the funds received are used within the conditions set. As we have said above, the General Assembly cannot be assumed to be diverting the funds. It is merely exercising its appropriation power within the purposes of the federal grants.

As to "contracts" with sub-grantees or private individuals, any such contracts made by the executive are subject to the appropriations power of the General Assembly. The law is read into all contracts as a part of its terms and conditions. *Home Building and Loan Association v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). Inherent in any contract with a government is the condition that the government cannot spend money absent an appropriation. Contracts involving federal funds stand on a footing no different from those relying entirely on state monies.

A state is precluded from adopting as a policy the destruction of contracts, but is not prohibited from exercising its sovereign power for legitimate motives even if in so doing it interferes with existing contracts. *El Paso v. Simmons,* 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965); *Home Building & Loan Association v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934); *De Paul v. Kauffman,* 441 Pa. 386, 272 A.2d 500 (1971).

The right of the General Assembly to appropriate funds from the State Treasury is expressly mandated by our Constitution itself. In the federal system the state retains its sovereign power over spending within the state, and under our Pennsylvania Constitution this sovereign power is to be exercised by the Legislature. Acts 117 and 17–A are valid legislation appropriate to the General Assembly's constitutional authority and were enacted for the purposes of exercising that authority most efficiently. If any contracts have thereby been impaired, that result is not prohibited if incidental to a state's exercise of sovereign power.

474

Appellants' last contention is that the General Assembly is not properly an intervening party to this action because the intention to intervene was never formally expressed through a joint resolution.

Appellants rely on a quote from Professor Sutherland to the effect that "A legislative body expresses its corporate will only by statute or resolution . . . ." Sutherland, Statutory Construction § 12.44, p. 322 (4th Ed. 1972). They conclude from this that a Joint Resolution was necessary before the General Assembly could have been held to have expressed its corporate will to intervene.

This argument is strained beyond the limits of logic. Professor Sutherland was writing in regard to the authorization of investigating committees, and the quoted language referred to the proper means of delegating the power to determine facts upon which legislation may be based. When the legislature delegates to a committee a power related to its legislative function, it may do so only through appropriate authorization setting adequate standards and guidelines. *Commonwealth v. Cherney*, 454 Pa. 285, 312 A.2d 38 (1973); *Penna. Human Relations Commission v. Chester School District*, 427 Pa. 157, 233 A.2d 290 (1967); *Annenberg v. Roberts*, 333 Pa. 203, 2 A.2d 612 (1938). Otherwise, the legislature abrogates its direct responsibility to the electorate and removes itself from accountability to the people.

The instant action, however, is wholly collateral to the legislative function. Although the General Assembly cannot delegate its legislative powers except within narrow confines, the management of its internal affairs is a matter left to its own discretion. There is no constitutional restriction upon delegation of affairs strictly internal.

The leadership of the General Assembly—the President and the President Pro Tempore of the Senate, and the Speaker and Majority Leader of the House—signed a written authorization to a law firm to represent them in this action. The firm petitioned the Commonwealth Court for permission to intervene. This permission was granted in an

opinion and order by President Judge Bowman, which we now affirm.

The General Assembly, like any corporate body, must manage its internal affairs through its leadership. It would be virtually impossible for each and every member to participate in the daily decisions which must be made regarding administrative details outside the legislative function, particularly when so many matters of legislative import which *cannot* be delegated demand their time and attention. The letter from the leadership of the General Assembly is sufficient authorization by that body in a matter which does not require formal delegation of legislative power.

Similarly, any corporate body may ratify action taken by its leadership either expressly or impliedly, even if proper authorization was originally lacking. The petition to intervene was filed on behalf of the General Assembly on July 9, 1976. Intervention was not finally permitted until the Order of October 18, 1976, and numerous petitions and appeals have ensued. It seems safe to assume, absent any word of dissent from the General Assembly in the interval of almost two years since the application for intervention was filed, that the General Assembly is satisfied with the action taken by its leadership and has impliedly ratified its intervention. Again, although an implied ratification would be impermissible as to any of its legislative functions, the General Assembly stands as any other corporate body as to those matters solely internal and not subject to Constitutional prohibitions.

The General Assembly's attorneys were retained by its leadership and paid from contingency funds appropriated to the legislature's leadership for incidental expenses, including "professional services." Retention of outside counsel may plainly be included as a legitimate expense in the category of professional services absent some showing to the contrary. Funds allocated by the General Assembly to its leadership for contingent expenses are a matter of inter-

nal management, and absent allegations by the General Assembly itself that its leadership exceeded its authority, we cannot find fault with an expenditure that appears in all ways valid.

In reality, the action taken by the legislative leaders was to defend the constitutionality of Acts which have been adopted by the General Assembly. Surely, the defense of legislation adopted by the General Assembly must be within the authority of its elected leaders.

We find the enactment of Acts 117 and 17–A of 1976 to be a valid exercise of the General Assembly's Constitutional appropriation's power and within the spirit and intent of the Constitutions of both the United States and Pennsylvania. Accordingly, we affirm the orders of the Commonwealth Court.

JONES, former C. J., did not participate in the consideration or decision of this case.

POMEROY, J., concurs in the result.

ROBERTS, J., filed a dissenting opinion in which O'BRIEN, J., joins.

ROBERTS, Justice, dissenting.

I dissent from the majority's holding that Acts 117[1] and 17–A[2] prevent the executive authority of Pennsylvania from using funds which the Law Enforcement Assistance Administration (LEAA) granted the Commonwealth to fund the Office of the Pennsylvania Special Prosecutor. I must also express my disagreement with the majority's assertions that a letter written by two members of the General Assembly and the Lieutenant Governor constitutes legislative action authorizing attorneys which those individual members have retained to seek intervention in this case on behalf of the entire General Assembly.

1. Act of June 29, 1976, P.L. 469, §§ 1 et seq., 72 P.S. §§ 4611 et seq. (Supp.1978). This bill was introduced by Senator Cianfrani.

2. Federal Augmentation Appropriation Act of 1976, Act of July 1, 1976, P.L. 1383, §§ 1 et seq.

## I.

### A.

Acts 117 and 17–A must be interpreted so that they do not conflict with a federal statute. Any other interpretation is unconstitutional under the Supremacy Clause. U.S.Const. art. VI. Congress intended that the LEAA funds granted to Pennsylvania to fund the Office of the Special Prosecutor be controlled solely by the executive authority of Pennsylvania and not by the Legislature. See Omnibus Safe Streets and Crime Control Act of 1968, P.L. 90–351, 82 Stat. 197, as amended, 42 U.S.C. § 3701 et seq. (1970 & Supp.), discussed infra. Therefore, Act 117 may not be interpreted, as the majority erroneously interprets it, to permit the Legislature to cut off federal funding of the Office of Special Prosecutor. So too Act 17–A may not be interpreted, as the majority interprets it, actually to cut off these funds. I am unwilling to attribute to Acts 117 and 17–A the unconstitutional mission of denying to the state executive authority Federal funds which the Congress has placed within the control of the executive. See Statutory Construction Act, 1 Pa.C.S.A. § 1922(3) (Supp.1978); *Sweet v. P. L. R. B.*, 457 Pa. 456, 462, 322 A.2d 362, 366 (1974) (Roberts, J., joined by Nix, J., concurring).

The majority asserts that there is no reason to believe Congress intended to give sole control of LEAA funds to the executive branch of state government. Congress, however, made the contrary intent perfectly clear in the Omnibus Safe Streets and Crime Control Act of 1968, P.L. 90–351, 82 Stat. 197, as amended, 42 U.S.C. §§ 3701 et seq. (1970 & Supp.). Section 203(a), 42 U.S.C. § 3723(a), provides that funds will be granted to a State planning agency which "shall be created or designated by the chief executive of the State or by State law and shall be subject to the jurisdiction of the chief executive."

With the aid of federal funds, this executive department planning agency is to develop a State plan to improve law enforcement in the state. Omnibus Crime Control Act, §§ 301, 303, 42 U.S.C. §§ 3731, 3733. Pursuant to the State

478

plan, state and local law enforcement officials and agencies are to receive and spend these funds. Id. §§ 303, 304, 42 U.S.C. §§ 3733, 3734. Congress thus made clear that funds which it has appropriated to the LEAA for improving state law enforcement are to be spent under plans designed and operated by the executive branch of state government, whose task it is to enforce the law.[3]

It was not until the fall of 1976, after Acts 117 and 17–A denied funding to the Pennsylvania Special Prosecutor's Office that Congress gave state legislatures a role in designing and approving State plans for LEAA assistance. Even then, Congress made the role of state legislatures purely advisory to the executive branch. Act of October 15, 1976, P.L. 94–503, § 108, 90 Stat. 2411, 42 U.S.C. § 3726.

In determining that State executive officers should retain control of projects funded by LEAA block grants under the Omnibus Crime Control Act, Congress was by no means limiting any "undoubted attribute of state sovereignty." *National League of Cities v. Usery,* 426 U.S. 833, 845, 96 S.Ct. 2465, 2471, 49 L.Ed.2d 245 (1976). The Act simply gives control of federal funds, granted for use in law enforcement, to the executive branch of state government. This Congressional decision recognizes that the executive branch traditionally has the greatest expertise and experience in the law enforcement field. The Act does not purport to impose any particular plan of law enforcement upon an unwilling state. Section 518(a) specifically disavows any federal authority to usurp state police functions. 42 U.S.C. § 3766(a).

3. By contrast, for example, the Elementary and Secondary Education Act of 1965, Act of April 11, 1965, P.L. 89–10, §§ 2 et seq., 79 Stat. 28, as amended, 20 U.S.C. §§ 241c et seq. (1970 & Supps.) (ESEA), provides that monies shall be granted to a "State," or a "State educational agency," 20 U.S.C. § 241g(a)(1), without specifying which branch or branches of state government should supervise activities funded by ESEA or the agency which directs the activities. In *Wheeler v. Barrera,* 417 U.S. 402, 416–17, 94 S.Ct. 2274, 2283, 41 L.Ed.2d 159 (1974), the Supreme Court held that the ESEA "evinces a clear intention that state constitutional spending proscriptions not be pre-empted . . . ." The reasoning of *Wheeler* applies with equal force to state statutory proscriptions on spending.

The Legislature's action, which prevented use of federal funds granted to run the Office of the Special Prosecutor, established under Pennsylvania's LEAA plan, violates the Congressional plan to aid state executive authorities in promoting the effective administration and enforcement of the criminal law. Neither the state legislature nor the state courts may alter the Congressional decision to give the executive branch control over these federal funds. Neither may the Legislature prevent the state executive from using federal funds for the purpose for which they were granted to the state by Congress and the LEAA. Acts 117 and 17–A, as applied by the majority, violate the express provisions of the Omnibus Crime Control and Safe Streets Act. Such an interpretation makes Acts 117 and 17–A unconstitutional under the Supremacy Clause, U.S.Const. art. VI. I would therefore interpret Act 117 so as not to give the Legislature control of those federal funds which Congress has appropriated to the exclusive control of the executive branch of state government, and would interpret Act 17–A so as to permit the executive branch to continue to receive and use LEAA funds.

When a state receives federal funds granted to it for a specific purpose, as here, for the Office of the Special Prosecutor, and then, as the majority permits, withholds these funds from that purpose, it must be apparent that the state is in violation of its governmental trusteeship of the granted funds. Here the executive has always sought, prior to and during this long-delayed litigation, to use these funds for the Office of the Special Prosecutor in accordance with the terms of the Congressional mandate and the LEAA grant. Acts 117 and 17–A, as interpreted by the majority, may not serve as the basis for withholding the federal funds granted and received by the state for the Office of the Special Prosecutor.

## B.

The majority's interpretation of Acts 117 and 17–A not only offends the Supremacy Clause of the United States Constitution, and makes those acts unconstitutional, but the

majority's application of these acts to withhold federal funds granted to the executive for the Office of the Special Prosecutor also violates the separation of powers doctrine as this Court has applied it to Pennsylvania government. The Special Prosecutor directed the work of the 1974 Special Investigating Grand Jury probing allegations of political and official corruption in Philadelphia. Acts 117 and 17–A, as applied by the Commonwealth Court and the majority, permit the legislative branch to curtail an investigation lawfully directed by the executive under the guidance of the judiciary. This Court has held that the Legislature may not, consistent with the Pennsylvania scheme of separation of powers, by statute deny a district attorney and a legally constituted investigating Grand Jury the power to continue its investigation. *Dauphin County Grand Jury Investigation Proceedings (No. 2)*, 332 Pa. 342, 348–58, 2 A.2d 802, 804–09 (1938).

By interpreting Acts 117 and 17–A to cut off federal funds to the Special Prosecutor, the majority allows the Legislature indirectly, through power over the purse, to stifle an investigation, which the Legislature may not do directly. Id. At the time of argument concerning the application for an injunction pending appeal in this case, November, 1976, employees of the Special Prosecutor's Office had worked for two months without compensation.[4] The number of active investigations had dropped from nineteen to four. The staff could not continue to work without pay indefinitely, and eventually Acts 117 and 17–A, as interpreted by the Commonwealth Court and the majority, resulted in the demise of that Office and the end of its investigations. There is in reality no legally comprehensible distinction between an act of the Legislature specifically terminating an investigation begun by a prosecutor and a Grand Jury, *Dauphin County Grand Jury Investigation Proceedings (No. 2)*, supra, and an act that, as here, is interpreted to shut off all funding to the Special Prosecutor and to end the functional life of the investigating Grand Jury.

4. During this time, the staff of the Special Prosecutor shrank from 43 to 17.

Either approach infringes upon those functions reserved to the executive and the judiciary. Cf. *Commonwealth ex rel. Carroll v. Tate*, 442 Pa. 45, 274 A.2d 193 (1971) (Courts must be funded to allow them to carry out their constitutional duties). Here, of course, no state funds were provided the Special Prosecutor, and federal funds granted by LEAA were withheld.

Interpreting Acts 117 and 17–A in a manner which ends the ability of a Grand Jury to function ignores "the grand jury's . . . special role in insuring fair and effective law enforcement. . . . The grand jury's investigative power must be broad if its public responsibility is adequately to be discharged." *Calandra v. United States*, 414 U.S. 338, 343–44, 94 S.Ct. 613, 617–18, 38 L.Ed.2d 561 (1974). The Grand Jury's investigative power may not be limited or, as here, terminated by legislation which is interpreted to withhold allocated federal funds. See 42 U.S.C. §§ 3733, 3734. Nor will our Constitution tolerate the refusal to provide state funds to this vital arm of law enforcement. Cf. *Commonwealth ex rel. Carroll v. Tate*, supra.

## II.

The majority's notion that the General Assembly may properly intervene as a party to this litigation is unsupported both factually and legally. The Assembly neither passed a resolution directing its officers to request intervention in this litigation, nor a statute or resolution authorizing any of its officers to request intervention or otherwise participate in lawsuits. Moreover, the General Assembly has passed no legislation authorizing the expenditure of funds for payment of counsel fees. If anything is certain in the legislative process, it is that a legislative body expresses its official views by enacting statutes or adopting resolutions. See generally, Pa.Const. art. II, §§ 1, 9.

Ernest P. Kline, President of the Senate and Lieutenant Governor, Martin L. Murray, President pro tempore of the Senate, and Herbert Fineman, then Speaker of the House, are the only three of the General Assembly membership who have expressed any desire for the Legislature to intervene in

482

this litigation. They did so in a letter to a law firm, whom they purported to engage as counsel for the General Assembly. These three officers cannot speak or act for the General Assembly without legislative authorization to do so. The signatories to this letter are elected pursuant to the Pennsylvania Constitution and constitutionally exercise only those duties the Assembly delegates to them. Pa.Const. art. II, § 9; art. III, § 17. The authority to seek intervention in this or any other litigation has not been delegated to these officers. The General Assembly therefore cannot be a party to this litigation.

This view does not impermissibly involve a judicial intrusion into the internal affairs of the Legislature. See *Sweeny v. Tucker*, 473 Pa. 493, 375 A.2d 698 (1977). Indeed, it protects the Legislature and enables it, as it chooses, to act as a body or through those officers to whom it has delegated its authority, without fear that unauthorized individuals will attempt to usurp its functions.

### III.

It is indeed regrettable that the majority, by misconstruing and misapplying Acts 117 and 17–A, frustrates the important work of the 1974 Special Investigating Grand Jury and stultifies the functioning of both the executive and judicial branches of our government in the enforcement of the criminal law. It is equally regrettable that the majority chooses to ignore the careful and clear Congressional plan for aiding state law enforcement authorities and to withhold federal funds allocated for that purpose. In so withholding these funds, and in refusing to provide for payment of state funds, the majority most unwisely makes this, or any other, investigating grand jury depend upon the will of those with power over the purse.

"The very genius of our tripartite Government is based upon the proper exercise of their respective powers together with harmonious cooperation between the three independent Branches. . . . However, if this cooperation breaks down, the Judiciary must exercise its inherent power to preserve the efficient and expeditious administration of

Justice and protect it from being impaired or destroyed." *Commonwealth ex rel. Carroll v. Tate,* 442 Pa. 45, 53, 274 A.2d 193, 197 (1971) (citations omitted). At this late stage in our understanding of the needs, functions, and obligations of our co-equal branches of government, a decision approving a doctrine of fiscal power without accountability over so crucial a part of the administration of criminal justice can only be viewed with concern. Moreover, it is a decision which, when implemented in the manner reflected on this record, invites public disrespect.

The Commonwealth Court order, dated October 5, 1976, denying the Office of Special Prosecutor federal funds allocated for its operation had the practical effect of closing down the Office. What the record plainly reveals is that without federal funds, the Office of Special Prosecutor became inoperative and incapable of performing its vital prosecutorial function, despite the efforts and dedication of prosecutors and staff who remained and worked for several weeks, and, in some instances, months, without being paid. Without the Special Prosecutor the investigating Grand Jury became ineffective and lifeless. Without an active and functioning Grand Jury, the investigation into political and governmental corruption came to an abrupt halt.

Viewed pragmatically, the majority's affirmance today of the Commonwealth Court order represents an exercise in futility. Both the Special Prosecutor and Grand Jury have been functionally nonexistent since late 1976. During the intervening months, the majority failed to disturb that order. See *Shapp v. Sloan,* No. 586 January Term, 1976 (Pa. Nov. 23, 1976) (Roberts, J., and Pomeroy, J., dissenting) (order denying injunction pending appeal).

One can only hope that in the near future, in another setting, the majority will change its view and adopt an approach more in harmony with today's enhanced public interest in the prompt and effective investigation of political and governmental corruption.

I dissent.

O'BRIEN, J., joins in this dissenting opinion.