James M. Burd et al., Petitioners *v.* Commonwealth of Pennsylvania, Department of Transportation et al., Respondents.

Eugene F. Scanlon et al., Petitioners *v.* Commonwealth of Pennsylvania, Department of Transportation et al., Respondents.

Argued December 16, 1981, before President Judge CRUMLISH, JR. and Judges BLATT, WILLIAMS, JR., CRAIG and MACPHAIL.

*Myrna P. Field,* with her *Joseph W. Marshall, III,* for petitioners, James M. Burd et al.

*Jack R. Heneks, Jr.,* Assistant Legal Counsel, with him *Michael T. McCarthy,* Chief Counsel to the Senate Democratic Floor Leader, for petitioners, Eugene F. Scanlon et al.

*Allen C. Warshaw,* Deputy Attorney General, with him *Mary Ellen Krober,* Deputy Attorney General, *John Hrubovcak,* and *LeRoy S. Zimmerman,* Attorney General, for respondents.

Opinion by Judge MacPhail, April 14, 1982:

Petitioners Burd, Scanlon and other named members of the Pennsylvania General Assembly[1] have filed motions for summary judgment in two cases brought in our original jurisdiction for a declaratory judgment and injunctive relief seeking to prevent the Pennsylvania Department of Transportation (PennDOT) from implementing an automobile emission inspection and maintenance program (I/M Program) to control air pollution in the greater Pittsburgh and Philadelphia areas.[2]

The program is the culmination of two federal suits brought against PennDOT and the Department of Environmental Resources (DER)[3] to enforce an inspection/maintenance provision of the state's air pollution implementation plan, required by the Clean Air Act and its 1970-1977 amendments.[4] Faced with a cut-off of federal grant funds, the parties entered into a consent decree approved by the Federal District Court on August 29, 1978 to implement the inspections either through a franchise system or a private garage system. PennDOT promulgated final regulations for the program on December 22, 1979,[5] and for the equipment standards on October 10, 1981,[6] although federal court

---

[1] In the Burd case, 1506 C.D. 1981, the Petitioners are members of the House of Representatives; in the Scanlon case, 1762 C.D. 1981, the Petitioners are members of the Senate. The cases have been consolidated by prior order of this Court for the purpose of this decision.

[2] On August 7, 1981 a petition for a preliminary injunction was denied by this Court. Subsequently, the Petitioners sought to have the Supreme Court of Pennsylvania assume extraordinary jurisdiction of the cases. That request was denied.

[3] *Delaware Valley Citizens Council for Clean Air v. Commonwealth of Pennsylvania*, No. 76-2068 (E.D. Pa.); *United States v. Commonwealth of Pennsylvania*, No. 77-0619 (E.D. Pa.).

[4] 42 U.S.C. §§7410(a)(2)(G).

[5] 67 Pa. Code §177.1 *et seq.*

[6] 11 Pa. B. 3519 (1981).

modification of the consent decree extended the final operational dead-line to May 1, 1982.

In October of 1981, the General Assembly overrode the governor's veto of House Bill No. 456[7] which prohibited PennDOT or any other executive agency from spending "any public funds for the establishment and administration of any system for the periodic inspection of emissions or emission systems of motor vehicles."

On January 22, 1982 the Federal District Court held the Commonwealth in contempt of court for failure to implement the consent decree.

The Petitioners, in addition to filing comments in response to the modification of the consent decree and attempting to intervene in the federal suits[8] instituted these actions challenging PennDOT's authority under state law to establish and implement the program as well as its authority to expend what they claim are unappropriated state funds to effectuate the plan.

Based on the joint stipulation of facts filed by the parties, we find no genuine issues as to any material fact remaining, thus discharging the first requirement for summary judgment under Pa. R.C.P. No. 1035.[9]

In support of their contention that they are entitled to judgment as a matter of law, the Petitioners maintain that PennDOT has no legislative authority to implement the I/M Program.

---

[7] Act No. 1981-99, 71 P.S. §523.

[8] By opinion and order filed March 1, 1982 the United States Court of Appeals for the Third Circuit affirmed the order of the Federal District Court which denied Petitioners the right to intervene. *Delaware Valley Citizen's Council for Clean Air v. Commonwealth of Pennsylvania* and *United States v. Commonwealth of Pennsylvania*, No. 81-2011 (3d Cir. March 1, 1982).

[9] Goodrich-Amram 2d §1035(b):5 (1976) states that "an agreed statement of facts can be the basis for a summary judgment." The agreed statement can be treated as admissions on file.

While it has been argued to us that the status of the cases in the federal courts to which we have previously referred should have no bearing on the outcome of the matter now before us, we must observe that the posture of the case presents a classic confrontation between the federal and state judicial systems. The Commonwealth of Pennsylvania is under a contempt order from a federal court for failure to implement an I/M Program. Petitioners would have us rule as a matter of law under stipulated facts that PennDOT has no statutory authority to establish, implement and maintain an I/M Program and that PennDOT should be enjoined from any further implementation of that program including the expenditure of Commonwealth funds for that program. Were we to enter such a judgment we would be placing PennDOT in the unenviable, and indeed impossible, situation of being subject to an order of this court, the effect of which would be to prohibit PennDOT from implementing the I/M Program at the same time that PennDOT is under a contempt order from a federal court for failing to implement that same program. No agency or department of the Commonwealth should be put in such a dilemma by this Court.

With respect to that part of the motion for summary judgment which asks us to restrain PennDOT from expending Commonwealth funds for this program, we must note that since the General Assembly of which all Petitioners are members has enacted legislation which provides specifically that no public funds shall be so expended, there is little if any effect we can give by way of judicial order to what the legislature has already accomplished without judicial intervention. It seems obvious to us that PennDOT cannot spend money it does not have.

We agree with Petitioners' contention that the delineation of executive and legislative authority has

been set forth in *Shapp v. Sloan,* 480 Pa. 449, 469, 391 A.2d 595, 604-05 (1978) as follows:

> It is the General Assembly, not the executive branch, which has been given the constitutional power to determine what programs will be adopted in our Commonwealth and how they will be financed. Although this may be done upon the recommendations of the executive branch, the final determinations are legislative in nature. The executive's function is to carry out those programs authorized by legislation.

Concerning PennDOT's statutory authority to implement any I/M Program, the parties before us call our attention to several provisions of the Vehicle Code (Code).[10] Section 4531 of the Code, 75 Pa. C. S. §4531, provides as follows:

> (a) *Compliance with established maximum levels.*—No vehicle manufactured in compliance with the requirements of the Clean Air Act (77 Stat. 392, 42 U.S.C. §1857), or any amendments or supplements thereto, shall have emissions exceeding the maximum permissible levels prescribed by law.
>
> (b) *Limitation on alteration of system.*— No person shall change or alter the emission control system of a vehicle in such a manner that it fails to comply with the prescribed emissions criteria. It is unlawful for the vehicle to be operated under its own power until a reinspection at an official inspection station establishes its full compliance.

It is difficult for this court to conceive of any clearer authority for an I/M Program than that set forth in the language just quoted. It seems clear to us that there is no way to assure compliance with the re-

---

[10] 75 Pa. C. S. §§101-9701.

quirements of the Clean Air Act other then by inspections as authorized by Section 4531(b).

Petitioners, of course, lay much emphasis upon other portions of the Code. In particular, they note that the predecessor to Section 4701 of the Code, 75 Pa. C. S. §4701[11] was Section 834 of The Vehicle Code (1959 Code), Act of April 29, 1959, P.L. 58, *as amended*, 75 P.S. §834, which read in pertinent part as follows:

(a)  Every owner of a motor vehicle . . . being operated in this Commonwealth, shall submit such motor vehicle to such inspection of its mechanism and equipment as may be designated by the secretary, *including such emission control systems and devices* for which the Secretary of Transportation, in consultation with the Secretary of Environmental Resources, has adopted inspection procedure and requirements which shall, to the extent possible and practical, be consistent with the requirements of the 'Clean Air Act'. . . . These requirements shall not apply within ninety (90) days after they are adopted, shall not be changed oftener than once a year and *shall apply only to those motor vehicles as are required by Federal law or regulation to be equipped with such emission control systems and devices. The inspection of such devices and systems* shall commence on the first day of inspection periods. . . . Such emission control systems and devices shall be inspected once a year. (Emphasis added.)

Since Section 4701 contains no language regarding emission controls, nor does Section 4702, 75 Pa. C. S.

---

[11] Section 4701 reads as follows:

No owner or driver shall refuse to submit a vehicle or a mass transit vehicle to any inspection and test that is authorized or required by the provisions of this chapter.

4702,[12] Petitioners would have us believe that it must follow as night the day that the failure of the legislature to provide for emission inspections in that subchapter of the Code relating to "Inspection Requirements" is proof positive that there was a legislative intent to eliminate such inspections.[13] Were it not for the provisions of Section 4531[14] we might be inclined

---

[12] Section 4702 reads as follows:

(a) *General Rule.*—The department shall establish a system of semiannual inspection of vehicles registered in this Commonwealth. . . .

(b) *Annual inspection of certain vehicles.*—Recreational trailers, vehicles registered as antique and classic vehicles, firefighting vehicles and motorcycles shall be subject to annual inspection.

(c) *Inspection of vehicles reentering this Commonwealth.*—Owners of Pennsylvania registered vehicles which have been outside of this Commonwealth continuously for 30 days or more and which at the time of reentering this Commonwealth do not bear a currently valid certificate of inspection and approval shall, within five days of reentering this Commonwealth, proceed to an official inspection station for an inspection of the vehicle.

(d) *Extension of inspection period.*—The department may, by regulation, extend the time for any of the inspections required by this chapter for not more than 30 days due to weather conditions or other causes which render compliance with the provisions of this chapter within the prescribed time difficult or impossible.

[13] We note that the subchapter relating to "Inspection Requirements" does not specify any of the mechanisms and equipment on a vehicle which must be inspected, but instead limits its scope to the *types of vehicles* which must be inspected. Thus, emission systems have not been singled out for exclusion from Sections 4701 and 4702 of the Code. We believe that Sections 4701 and 4702 were not intended to either limit or specify the equipment which may be subject to inspection.

[14] The predecessor to Section 4531 was Section 850 of the 1959 Code which read, in part, as follows:

*Removal of Emission Control Devices Unlawful.*—(a) It shall be unlawful for any person to operate knowingly a vehicle which has been manufactured to comply with the

to agree, but the question we must ask is what is the purpose of Section 4531 if not to address the motor vehicle emissions problem? We believe the answer to that question is that the Legislature as constituted in 1976 chose to insert a new and separate subchapter in the Code entitled "Safety and Anti-Pollution Equipment". The most obvious place to insert a provision relating to the inspection of emission control systems was in the new sub-chapter devoted exclusively to safety and anti-pollution equipment. It seems to us that the legislative drafting is very logical and succeeds in preserving the statutory authority for PennDOT to establish, implement and maintain an I/M Program. At the very least, we are unable to say as a matter of law that there is no such authority.

A summary judgment may be entered when a case is clear and free from doubt, when the moving party establishes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law, viewing the record most favorably to the non-moving party. *Pennsylvania Public Utility Commission Bar Association v. Thornburgh*, Pa. Commonwealth Ct. , 434 A.2d 1327 (1981). We cannot say that the instant case is clear and free from doubt.

Since we conclude that PennDOT has the authority but not the financial means to establish, implement and maintain an I/M Program, we will deny the motion for summary judgment.

### ORDER

Petitioners' motion for summary judgment is denied.

---

requirements of the 'Clean Air Act' . . . if any emission control device on such vehicle has been removed, rendered inoperative, or altered from inspection requirements adopted pursuant to Section 834 of this act.

### AMENDED ORDER

The Petitioners' motion to amend the order of this Court entered April 14, 1982 is granted and the said order is amended by adding thereto the following:

We hereby certify that this order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from this order may materially advance the ultimate termination of the case above captioned.

Judge PALLADINO did not participate in the decision in this case.

---

DISSENTING OPINION BY JUDGE CRAIG:

PennDOT's auto emission inspection program should be enjoined because, at the very least, this court has today flatly decided that expenditure of public funds for that program would be unlawful.

This court's opinion today clearly states that the legislature has "already accomplished" a prohibition "specifically that no public funds shall be . . . expended" on this program.

The opinion of this court states that it is "[b]ased on the joint stipulation of facts filed by the parties. . . ." In paragraph 32 of that record document constituting the facts before us, PennDOT expressly stipulated as follows:

> Respondent, PennDOT, has and is continuing to carry out the provisions of the aforementioned consent decree. Said performance has and will continue to include the expenditure of state funds.

In addition, at par. 37 of the Joint Stipulation, PennDOT admits:

Respondent, PennDOT, is implementing the auto emission I/M program pursuant to its belief that [the statutes] empowers them to do so. Although the stipulation was executed July 31, 1981, before the legislative cutoff of funds took effect on October 5, 1981, PennDOT has not thereafter revised or abandoned that stipulation in any way. Moreover PennDOT continues the program regulations in effect, at 67 Pa. Code Ch. 177, including an updating amendment which PennDOT filed October 9, 1981, see 11 Pa. B. 3521, *after* the law took effect.

Thus PennDOT does indeed propose to go ahead. PennDOT certainly has general funds, even though not earmarked for this purpose, and stipulates that it is proceeding with activities which would require expenditures, at least for salaries and office expenses, related to implementing the program.

This court has the duty to enjoin illegal expenditures when, as here, they are threatened. When legislators have asked that we enjoin this threatened violation of a law prohibiting the expenditure of funds, how can this court say that no injunction is needed simply because there is a law prohibiting the expenditure of funds?

As to the idea of deferring to the federal court, this court cannot abdicate its power and responsibility in favor of a federal court order resting upon an administrative agency's consent contrary to Pennsylvania law, where performance would require defiance of the two-thirds vote of Pennsylvania's elected lawmakers. Even when brought into court by other parties, Penn-DOT cannot legislate for the people of Pennsylvania by the device of a consent order. As the federal courts repeatedly acknowledge, the Pennsylvania courts have the paramount authority to interpret Pennsylvania law. Moreover, in the federal cases relating to this matter, the federal courts have not even been pre-

sented with the question of Pennsylvania legislative authority.[1]

When we turn to examine realistically the emissions inspection program as stipulated, we see Penn-DOT proposing to enforce state and federal anti-pollution laws by inspecting only automobiles registered in limited areas in and around Philadelphia and Pittsburgh, as if automobiles from elsewhere were not mobile enough to move into the urban areas from their own habitats—a scheme which is puzzling, not to say discriminatory.

As the Supreme Court stated in *Shapp v. Sloan*, 480 Pa. 449, 391 A.2d 595 (1978):

> It is the General Assembly, not the executive branch, which has been given the constitutional power to determine what programs will be adopted in our Commonwealth and how they will be financed. Although this may be done upon the recommendations of the executive branch, the final determinations are legislative in nature. The executive's function is to carry out those programs authorized by legislation.

480 Pa. at 469, 391 A.2d at 604-05.

Even before we proceed to examine the statutory section governing inspection programs to see if there is authority for any kind of emissions systems inspection, it is apparent at the outset that this fragmentary program violates the general statutory provision on which PennDOT chiefly relies, 75 Pa. C. S. §4531, the section that expresses the anti-pollution goal *throughout* Pennsylvania in regulatory terms as follows:

---

[1] *Delaware Valley Citizens Council for Clean Air v. Commonwealth of Pennsylvania,* F. Supp. (No. 76-2068, E.D. Pa., filed May 20, 1981) ; *United States v. Commonwealth of Pennsylvania,* F. Supp. (No. 77-0619 E.D. Pa., filed June 16, 1981) ; both affirmed F.2d (No. 81-2303, filed March 1, 1982).

(a) Compliance with established maximum levels.—*No* vehicle manufactured in compliance with the requirements of the Clean Air Act[2] ... shall have emissions exceeding the maximum permissible levels prescribed by law.

(b) Limitation on alteration of system.— *No* person shall change or alter the emission control system of a vehicle in such a manner that it fails to comply with the prescribed emissions criteria. It is unlawful for the vehicle to be operated under its own power until a reinspection at an official inspection station establishes its full compliance. (Emphasis added.)

Thus, on a *statewide* basis, the legislature has established in subsection (a) the compliance requirement as to vehicle manufacture, backing up federal regulation of manufacturing, and by subsection (b) limited individual removal of factory-installed emissions controls, prescribing the regular official inspection procedure as a precondition to reuse of the automobile if such a violation occurs. No fractional scheme, confined only to a few urban neighborhoods, can rationally look to those subsections as its authorization because their thrust is exclusively statewide.

In addition, the Commonwealth's elected lawmakers in the General Assembly have made it doubly clear that no bureaucracy or court has lawful authority to concoct a special emissions systems inspection program because (1) the legislature specifically amended the Vehicle Code to *delete* all reference to specialized emissions control systems inspections from the basic inspection authorization and (2) as a strong confirmation, the legislature subsequently went ahead to adopt, over the governor's veto, a clearcut prohibition against expending any public funds on such a special program.

---

2 42 U.S.C. §§7410(a)(2)(G).

The only statutory foundation for any auto inspection program today is stated in Sections 4701 and 4702 of The Vehicle Code,[3] which read:

§4701. Duty to comply with inspection laws.

· No owner or driver shall refuse to submit a vehicle or mass transit vehicle to any inspection and test that is authorized or required by the provisions of this chapter.

§4702. Requirement for periodic inspection of vehicles.

(a) General rule.—The department shall establish a system of semi-annual inspection of vehicles registered in this Commonwealth and mass transit vehicles operated in this Commonwealth. . . .

PennDOT contends that the general terms of those sections, coupled with the mandate of Section 4531, quoted above, which provides for emission control systems on automobiles, compels a conclusion that it is authorized to execute its program.

However, in the first place, the clear terms of Sections 4701 and 4702 expressly provide authority for an inspection program which is *semi-annual* and, because it covers the "vehicles registered in this Commonwealth," is *statewide*, 75 Pa. C. S. §4702(a). PennDOT's fragmentary program, involving only a once-yearly inspection and covering only a minor fraction of the state, is clearly outside of that authorization.

Moreover, the true meaning and effect of the inspection authorization in Sections 4701 and 4702 is shown by the fact that those sections *dropped* the words of their antecedent, 75 P.S. §834(a), which *formerly* required inspection of a vehicle's "mechanism and equipment . . . including such emission control

---

[3] Act of June 17, 1976, P.L. 162, *as amended*, 75 Pa. C. S. §§4701, 4702.

systems and devices," and only formerly provided for yearly inspections in conjunction with inspection procedure requirements for vehicles required by federal law to be equipped with emission control systems.[4]

In the earlier section now repealed, the explicit nature of the express reference to emission control inspection indicated legislative cognizance of Penn-DOT's lack of general authority to mandate special emission systems inspections. Then the subsequent elimination of that language by Section 4701 was a definite expression of a reversal of the legislature's intent to allow such a program. *Masland v. Bachman*, 473 Pa. 280, 374 A.2d 517 (1977); *Commonwealth v. Lowe Coal Co.*, 296 Pa. 359, 145 A. 916 (1929). As an example, in *Department of Transportation v. Searer*, 50 Pa. Commonwealth Ct. 468, 413 A.2d 1157 (1980), this court held that where an exception in Section 819

---

[4] The 1972 version of the Act of April 29, 1959, P.L. 58, *as amended*, 75 P.S. §834(a) stated:

(a) Every owner of a motor vehicle . . . being operated in this Commonwealth, shall submit such motor vehicle to such inspection of its mechanism and equipment as may be designated by the secretary, *including such emission control systems and devices* for which the Secretary of Transportation, in consultation with the Secretary of Environmental Resources, has adopted inspection procedure and requirements which shall, to the extent possible and practical, be consistent with the requirements of the 'Clean Air Act'. . . . These requirements shall not apply within ninety (90) days after they are adopted, shall not be changed oftener than once a year and *shall apply only to those motor vehicles as are required by Federal law or regulation to be equipped with such emission control systems and devices. The inspection of such devices and systems* shall commence on the first day of inspection periods. . . . Such emission control system and devices shall be inspected once a year. (Emphasis supplied.)

75 P.S. §834 was repealed by the Act of June 17, 1976, P.L. 162, when the legislature enacted a consolidated Motor Vehicle Code.

(b) of the previous Vehicle Code—allowing an employer to avoid a sanction for an employee's issuance of a certificate of inspection without performing the inspection if the employer had no knowledge of the violation—was eliminated in the new Section 4730(b), "the elimination must be presumed to eliminate the opportunity for a holder of a certificate of appointment to bring himself within [the] exception." 50 Pa. Commonwealth Ct. at 472, 413 A.2d at 1159.

Clearly, the General Assembly, in consciously eliminating the authorization for emission inspections, intended to withhold the power to implement such a program under the current Vehicle Code.

PennDOT's reasoning, that the legislature implicitly recognized its authority to implement the program by its repeated attempts to pass bills which would prohibit or delay the plan, is defective because it is incorrect to assume that legislatively created administrative agencies possess all powers except those prohibited by law. *Shapp.*

Moreover, in view of the continued actions of PennDOT,[5] moving forward as if there were a legal authorization, we have the fact, noted above, that the legislature also proceeded in October of 1981 to override a gubernatorial veto of House Bill No. 456 and thereby to adopt a specific prohibition forbidding PennDOT or any other executive agency from spending "any public funds for the establishment and administration of any system for the periodic inspection of emissions or emissions systems of motor vehicles."

How much clearer could legislative intention be made?

In light of the foregoing, it is also plain that the emissions control inspection program was not authorized on the basis of appropriations to PennDOT for

---

[5] 67 Pa. Code §177.1 *et seq.;* 11 Pa. B. 3519 (1981).

fiscal years 1979-80, 1980-81 and 1981-82 for the "Safety Administration and Licensing" line-item of the budget. A conclusion that the legislature authorized the plan or knowingly appropriated state funds for it is simply not warranted by the single-paragraph references to the emissions inspection program contained in the governor's budget requests of over eight hundred pages, nor by the annual appropriations of approximately thirty-five million dollars to the "Safety Administration and Licensing" line-item, which funds a multitude of programs and functions.

Because PennDOT has no legal authority to implement the emissions inspection program, we should grant the petitioners' motions for summary judgment.

Judge WILLIAMS, JR. joins this dissent.