595 A.2d 15

**In re 1983 AUDIT REPORT OF Paul BELCASTRO, Controller.**

**In re 1984 AUDIT REPORT OF Paul BELCASTRO, Controller.**

**In re 1985 WASHINGTON COUNTY ANNUAL FINANCIAL REPORT SURCHARGE.**

**Appeal of Paul BELCASTRO, Controller of Washington County, Pennsylvania.**

Supreme Court of Pennsylvania.

Submitted Sept. 24, 1990.

Decided July 12, 1991.

30

Robert F. Wagner, Christine A. Ward, Dickie, McCamey & Chilcote, P.C., Pittsburgh, for appellant.

Melvin B. Bassi County Sol., Charleroi, for County of Washington.

Anthony J. Seneca, Washington, for Sheriff Fazzoni.

John Soloman, Washington, for Belcastro.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION

CAPPY, Justice.

The issues presented by this appeal involve the propriety of several surcharges levied against the Commissioners of Washington County by the Controller in her 1983, 1984 and 1985 Annual Financial Reports.[1]

The 1983, 1984 and 1985 Annual Financial Reports filed by the County Controller contained sixteen surcharges levied against the Commissioners and two surcharges levied against the Sheriff on the basis of numerous expenditures made from the Sheriff's Petty Cash Fund. The propriety of those surcharges was appealed to the Court of Common Pleas of Washington County which dismissed all but one of the surcharges against the Commissioners. The surcharges levied against the Sheriff were consolidated for trial following which the trial court dismissed a portion of those expenditures on which the surcharges were based, thereby substantially reducing the amount of the surcharge levied against the Sheriff. Post-trial motions were filed whereupon the trial court reaffirmed its determination with respect to the Commissioners, but further reduced the amount surcharged against the Sheriff. Cross-appeals were filed in the Commonwealth Court. The Commonwealth Court affirmed the dismissal of all of the surcharges imposed on the

1. Pursuant to Pennsylvania Rules of Appellate Procedure, Rule 502(c), when a public officer is a party to an appeal and during the pendency of the appeal, ceases to hold office, his or her successor is automatically substituted as a party. Therefore, we have substituted, in the caption of this case, Paul Belcastro, the current Controller of Washington, for that of Patricia A. Beharry, the Controller in office during the period of time at issue here. However, for the sake of clarity we will refer to the Controller as "her," representing Patricia A. Beharry, throughout the body of our opinion.

Commissioners with the exception of the AT & T surcharge [2] and affirmed the imposition of the surcharge against the Sheriff as amended by the trial court, 116 Pa.Cmwlth. 613, 544 A.2d 514.

## I. PREREQUISITE TO LEVYING A SURCHARGE

■ The first issue presented in this appeal is whether a County Controller who has actual or implied knowledge of the questionable nature of a claim which has been presented for approval must first refuse payment pursuant to 16 P.S. § 1752 as a prerequisite to levying a surcharge on that item pursuant to 16 P.S. § 1730. Both the trial court and the Commonwealth Court found that a controller, who possesses such knowledge, must refuse payment before he or she can issue a surcharge. We agree.

Section 1752 provides as follows:

> If the controller does not approve a claim, bill or demand presented to him, he shall within thirty days forward it to the county commissioners together with his notice that he has refused to approve the same and his reasons therefor. The county commissioners shall consider the claim, bill or demand and, if they consider that it should be paid by the county, they shall so notify the controller. If the controller thereafter continues to refuse his approval no payment shall be made thereon by the county except pursuant to an order of court upon a proper issue thereto directing the controller to approve payment.

16 P.S. § 1752. Section 1730, on the other hand, sets forth the post-audit functions of the controller as follows:

2. That portion of the trial court's order pertaining to the AT & T surcharge was vacated and the case remanded for the taking of additional evidence and additional factfinding on the limited question of the amount of actual loss. That issue has also been appealed to this Court at a separate docket number.

**Filing reports**

(a) The reports of the controller or auditors shall be filed among the records of the court of common pleas of the county.

(b) The amount of any balance or shortage, or of any expenditure of a kind, or made in a manner, prohibited or not authorized by statute, which causes a financial loss to the county shall be a surcharge against any officer against whom such balance or shortage shall appear, or who by vote, act or neglect, has permitted or approved such expenditure, but no elected or appointed official of a county shall be surcharged for any act, error or omission in excess of the actual financial loss sustained by the county, and any surcharge shall take into consideration as its basis the results of such act, error or omission and the results had the procedure been strictly according to law. The provisions hereof limiting the amount of any surcharge shall not apply to cases involving fraud or collusion on the part of officers, nor to any penalty enuring to the benefit or payable to the Commonwealth.

16 P.S. § 1730.

The Controller argues that the above provisions of the County Code do not support the finding that the refusal to pay is a prerequisite to levying a surcharge and that the construction given these statutes by the Commonwealth Court is contrary to the protection of the public because such an interpretation seriously undermines the effectiveness of the Controller to check unauthorized expenditures and significantly reduces the accountability of those in county government who are entrusted with public funds. It is the Controller's contention that the Commonwealth Court's interpretation of the relevant provisions of the County Code creates an unworkable system of county government and deprives the public of a mechanism by which to recoup unauthorized or illegal expenditures. In the alternative, she argues that even if a prerequisite refusal to pay does exist, such requirement should have been excused here because she had been denied an auditor.

■ In support of its finding that a prior refusal to pay is a prerequisite to levying a surcharge, both the trial court and the Commonwealth Court noted that Section 1752 provides for early judicial intervention into disputes between the Controller and the Commissioners thereby avoiding the necessity for surcharges long after county funds have been perhaps erroneously expended. In addition, early discovery of misspent funds helps protect the public treasury. We agree with this rationale and would add, as the trial court so aptly noted, that the imposition of surcharges should be reserved for those situations involving personal gain, favoritism, fraud or other instances where the questionable nature of a claim would not have come to the attention of the controller at the time such claim was originally presented. Most importantly, we agree with the Commonwealth Court's conclusion that this interpretation of the County Code would foreclose the likelihood of a controller, who knows of the questionable nature of a claim, from avoiding giving notice to the claimant, thus permitting these claims to accrue and then subsequently surcharging county officials for amounts in excess of the original claim merely as a retaliatory tactic.[3]

Accordingly, we hold that where a controller has actual or implied knowledge of a disputed claim, a prior refusal to pay a disputed claim is a prerequisite to levying a surcharge thereon. We will now review, *seriatim*, the particular surcharges levied against the Commissioners regarding the contracts entered into with Felice Associates, Inc.; R.B.A.

---

**3.** The Controller also argues that she should be excused from any statutory violations due to the Commissioners' failure to provide her with an adequate auditing staff and their failure to allow a sufficient salary for the position of Solicitor to the Controller. The argument as to the failure to provide an adequate auditing staff relates to the surcharges levied against the Sheriff (discussed infra). However, assuming arguendo that she was inadequately staffed, the alleged failures of the Salary Board and the Controller's staff cannot be attributed to the Sheriff. As for her argument that without a solicitor she was unable to understand her statutory duties, we note that it appears that she did have a solicitor during the period in question and that even if not, the lack of a solicitor is irrelevant as she, alone, is responsible for performing her duties in accordance with law.

Professional Data Systems, Inc.; and Bedway Security Agency, Inc., to determine whether the Controller could be charged with the requisite knowledge of the questionable nature of the particular claim prior to her approving payment thereon.

## FELICE ASSOCIATES, INC.

Felice Associates, Inc. (Felice) has provided labor relations consulting services to the County of Washington since 1972. The original contract entered into between Felice and the County, dated July 13, 1972, set the rate of compensation at $45.00 per hour. In September, 1980, Felice sent a letter to the Commissioners requesting a $5.00 per hour increase for its services. The Commissioners agreed to this increase, but failed to provide the Controller a copy of the letter agreeing to this increase. From September 1980 to February 1984 vouchers were submitted and approved at the increased rate of $50.00 per hour. In February 1984, the Controller notified the Commissioners that she would process invoices at the rate of $45.00 per hour, but that she would be happy to honor an amendment to the agreement. The Commissioners entered into a formal agreement with Felice in September 1984 setting the hourly rate at $50.00 and making the increase retroactive to September 1980. In the 1983 Annual Report, the Controller surcharged the Commissioners in the amount of $1155.00 which represented the number of hours invoiced in 1983 multiplied by five. By agreement of the parties, this amount was reduced to $1135.00.

Clearly, the Controller knew or should have known that the vouchers being submitted at $50.00 per hour were in excess of the contract rate. The Controller was in possession of the original contract which set the rate of compensation at $45.00 per hour. However, she continued to approve vouchers submitted at the rate of $50.00 per hour, without question, for more than three years. We conclude, as did the trial court and the Commonwealth Court, that the Controller, therefore, should have known that the vouchers

being approved were in excess of the contract rate. Accordingly, we affirm the dismissal of the surcharges imposed as a result of the Felice contract.

## R.B.A. PROFESSIONAL DATA SYSTEMS, INC.

R.B.A. Professional Data Systems, Inc. (RBA) provides data processing and information management services to the County of Washington. There were two written contracts entered into between RBA and the County, one of which covered programming services and equipment to the Domestic Relations and the other one for leasing equipment. During 1983 and 1984, a number of services were performed by RBA which did not fall within either of the two existing contracts. Nevertheless, the Controller approved several invoices submitted by various personnel which covered services rendered by RBA. Following the filing of the 1983 Annual Financial Report, the Controller surcharged the Commissioners in the amount of $16,544.90 representing the total payments made to R.B.A. for which there was no written contract.

The trial court found as fact that whenever any of the departments experienced a problem with the County's computer system, or were in need of service or programming thereon, they would contact the Computer Manager for the County, Jack Welty, who would initially attempt to correct the problem. However, if he needed further assistance, he would contact RBA to get an estimate of the amount of work required and the cost. RBA would then either submit its estimate to Mr. Welty or directly to the manager of the department requesting the work. The matter would then be submitted to the Commissioners for approval.

Interestingly, in December 1983, the Controller herself contacted Jack Welty requesting that some changes be made to the computer program in her office. Mr. Welty and the Controller then met with a representative of RBA to discuss the work to be performed. Thereafter, RBA sent a letter to the Controller confirming that the services she requested would cost $1,500 to $2,000. The Controller

authorized the work without first seeking the approval of the Commissioners. Following performance of the required services by RBA, the Controller approved a voucher payable to RBA, but the Commissioners refused to honor the voucher because they had not authorized the work. Thereafter, the Controller levied the surcharges at issue here against the Commissioners for allegedly authorizing vouchers for payments to RBA based upon the approval of other department managers. While the Controller submitted that other departments were not required to seek approval from the Commissioners before engaging RBA's services, the evidence belied this contention.

The Controller consistently approved, without objection, the payments which are the subject of the current surcharges. Pursuant to 16 P.S. § 1801, copies of all contracts entered into on behalf of the county are to be filed in the controller's office. Thus, had the Controller performed her statutory duty to verify all claims she would have checked the files and would have realized that the County had not entered into any contract for these services. *See,* 16 P.S. § 1750. Accordingly, we conclude that the Controller should have known that these services were not covered by any contract prior to her approving payment thereon and is, therefore, precluded from levying surcharges against the Commissioners on the basis of their payments made to RBA for these services.

## BEDWAY SECURITY AGENCY, INC.

On November 14, 1984, the County entered into a contract with Bedway Security Agency, Inc. (Bedway) whereby Bedway was to provide security guard service at the County Health Center at the cost of $5.75 per hour. On November 7, 1985, the parties signed an addendum to that agreement continuing services indefinitely. In her 1985 Annual Report, the Controller surcharged the Commissioners in the amount of $36,252.18 for their failure to bid the contract for

guard services.[4] While the trial court found that the services supplied by Bedway were not exempt from the bidding requirement, it nevertheless dismissed the surcharges on the basis of the Controller's failure to refuse payment prior to issuing the surcharge.

The Controller approved all vouchers submitted to her and all monies due under the contract were paid to Bedway. Then, in 1986, the Controller surcharged the Commissioners for all payments made in 1985 pursuant to the contract. The Controller never notified the Commissioners that she questioned the legality of the contract with Bedway. Indeed, her continuing approval of all vouchers submitted for Bedway's services quite clearly evinced that she had tacitly approved the contract. The Controller was in possession of the agreements entered into with Bedway. Had she withheld her approval of any vouchers when such were first submitted as she is required to do under 16 P.S. § 1752, the validity of the contract could have been determined prior to monies being paid from the County treasury for an entire year. The surcharges imposed by her on the basis of the Bedway contracts were, therefore, properly dismissed.[5]

## II. BIDDING REQUIREMENT

The next issue presented is whether the surcharges levied against the Commissioners for their failure to solicit competitive bids pursuant to 16 P.S. § 1802 regarding two particular contracts were properly dismissed. Section 1802 provides in relevant part as follows:

4. The amount surcharges represented the total amount paid under the contract with Bedway.

5. The trial court went on to find that had the Controller followed the procedures set forth in § 1752, the surcharges would have been proper because the services rendered by Bedway did not constitute "professional expert advice" and, therefore, the contract for guard services should have been bid. See, 16 P.S. § 1802(h)(5) discussed infra. However, having concluded that the trial court properly dismissed these surcharges pursuant to 16 P.S. § 1752, we need not address the issue posed by 1802(h)(5) and expressly decline to rule thereon with regard to the services rendered by Bedway.

(a) All contracts for services and personal property where the amount thereof exceeds the sum of four thousand dollars ($4,000), shall be written and shall, except as otherwise hereinafter specified, be made by advertising for bids.

(h) The contracts or purchases made by the commissioners involving an expenditure of over four thousand dollars ($4,000) which shall not require advertising or bidding, as hereinbefore provided, are as follows:

(5) Those involving services of members of the medical or legal profession, registered architects, engineers, certified public accountants or other personal services involving professional expert advice.

The Controller levied surcharges against the Commissioners for their failure to bid two contracts. It is the Controller's contention that neither a contract for standardized testing services nor a contract for the use of data processing software and hardware involve "professional expert advice" and, therefore, are not exempt from the bidding requirement. The Commonwealth Court agreed with the trial court's determination that the two contracts at issue here involved professional expert advice and were, therefore, exempt from the bidding process under subsection (5) above. We agree.

The issue of what constitutes "professional expert advice" is one of first impression. While professional service exemptions to public contract bidding is common practice throughout the Commonwealth, there is virtually no case law defining the terms "professional expert services and/or advice." Thus, this case presents us with the opportunity to establish guidelines to be applied not only in the instant case, but to all those instances where competitive bidding is required.[6]

6. While several other states provide for a similar exemption, a review of the statutes and case law of those states provides little or no guidance as to a workable definition of "professional services." For instance, some of the states specifically enumerate those services which will be exempt from bidding such as accountants, engineers, physicians and lawyers and do not include a "catch-all" phrase such as

The Commonwealth Court decision in *Doverspike v. Black*, 126 Pa.Commw. 1, 535 A.2d 1217 (1988), *aff'd per curiam*, 126 Pa.Commw. 11, 541 A.2d 1191 (1988) provides some assistance. There the Commonwealth Court was asked to determine whether the real estate appraisal services offered by 21st Century Appraisals, Inc. involved professional expert advice so as to exempt the contract for those services from competitive bidding. The court therein found that post-baccalaureate studies and state certification or licensure were not prerequisites for a finding of "expert advice" under Section 1802(h)(5). We agree with the Commonwealth Court's conclusion that post-baccalaureate studies and state certification or licensure are not prerequisites for a finding of "professional expert advice," but believe that proper resolution of this issue requires further definition.

The Controller argues that the general reference in the statute to "other personal services involving professional expert advice" should be restricted to those professions specifically enumerated in subsection (5). To accept her argument would be to ignore the plain language of the statute. Clearly, if the legislature intended to limit the

Pennsylvania. *See e.g.,* Cal.Gov't Code §§ 31000 and 53060; Mass. Gen.L. ch. 30B, § 1 (1990); and Ohio Rev.Code Ann. § 307.86. Other states employ statutory language similar to that of Pennsylvania and determine on a case-by-case basis what constitutes "professional services." *See e.g.,* N.J.Rev.Stat. § 40A:11–5; *In the Matter of the Petition of Gloria E. Soto for a Declaratory Ruling as to the Applicability of N.J.S.A. 5:12–138 to Certain Political Activities; Gloria E. Soto v. State of New Jersey, New Jersey Casino Control Commission and Department of Law and Public Safety, Division of Gaming Enforcement,* 236 N.J.Super. 303, 565 A.2d 1088 (1989); *Autotote Limited v. N.J. Sports & Exposition Authority,* 85 N.J. 363, 427 A.2d 55 (1981); *Burlington Tp. v. Middle Dep't. Inspection Agency,* 175 N.J.Super. 624, 421 A.2d 616 (Law Div.1980). New York, on the other hand, has created, by case law, an exemption for those services involving professional skill and knowledge from its public bidding requirements and determines on a case-by-case basis what constitutes professional services. N.Y.Municipal Law § 103; *Goldwin–Kent, Inc. v. Broome County,* 107 Misc.2d 722, 435 N.Y.S.2d 1011 (1981); *Amherst Columbia Ambulance Service, Ltd. v. Gross,* 80 A.D.2d 719, 437 N.Y.S.2d 137 (1981); *Doyle Alarm Co., Inc. v. Reville,* 65 A.D.2d 916, 410 N.Y.S.2d 466 (1978); *American Totalisator Co., Inc. v. Western Regional Off–Track Betting Corp.,* 44 A.D.2d 750, 396 N.Y.S.2d 301 (1974).

exemption for bidding to contracts involving services of the those professionals specifically enumerated there would have been no basis for the inclusion in the statute of the above quoted portion.

 We define "other personal services involving professional expert advice" as including such services which involve quality as the paramount concern and require a recognized professional and special expertise. For instance, some services may require advanced technological capabilities which makes the quality of the service more valuable than the price of the service. In other words, where quality is of little concern, perhaps because the product or service varies little from company to company, competitive bidding should be required. For example, contracts for office supplies or equipment would be, generally, subject to the public bidding requirements. But, where quality of the service is the paramount concern, the service should be exempt from the bidding requirements found in the County Code. In setting forth these guidelines, we remain mindful of the public policy concerns underlying the general requirement that public contracts be competitively bid. We have long held that competitive bidding guards against favoritism, improvidence, fraud, and corruption in the awarding of public contracts. *See, Weber v. City of Philadelphia,* 437 Pa. 179, 262 A.2d 297 (1970); and *Price v. Philadelphia Parking Authority,* 422 Pa. 317, 221 A.2d 138 (1966).

The Controller levied surcharges against the Commissioners for their failure to bid the contract entered into with SAMS Associates and the contract entered into with Aptech Computer Systems, Inc. Applying the above guidelines, we will now review the particulars of the two contracts at issue.

## SAMS ASSOCIATES

SAMS Associates (SAMS) provided standardized testing services for participants in the Job Training Partnership Act Programs. SAMS provided counseling for the participants;

made an independent judgment from the raw score of the testing; and made a recommendation to the agency concerning each applicant. The Controller maintains that SAMS employed untrained clerical workers who possessed no specific qualifications nor license and who merely administered and scored a standardized test. The Controller levied a surcharge in the amount of $218,228.20 against the Commissioners for their failure to bid the contract.

The trial court found that SAMS employees are college graduates with expertise in testing and counseling and that the services rendered by SAMS require special skill, training, knowledge and judgment. Each individual applicant was tested and evaluated by SAMS for such characteristics as intelligence, educational skills, and physical ability. An individual profile of each applicant was then provided by SAMS. The information provided in these profiles was then used to find suitable training and/or employment for the participants. We agree with the trial court's finding that these services required special skill, training and expertise. Based upon the foregoing, we conclude that SAMS provided Washington County "professional expert advice" and therefore, the contract entered into between SAMS and the County was exempt from the bidding requirements of Section 1802(h)(5).

## APTECH COMPUTER SYSTEMS, INC.

Aptech Computer Systems, Inc. (Aptech) provides telephone cost management services. The Commissioners entered into a contract with Aptech for the purchase of data processing software and equipment. The program developed by Aptech enabled the County to monitor the telephone lines of the various county departments. At the end of each month, Aptech submitted a report to the County which included information such as the cost, the department making the phone call, and the trunk line that was used. In the 1985 Annual Financial Report, the Controller levied a surcharge against the Commissioners in the amount of

$5,629.46 based upon their failure to bid the data processing services provided by Aptech.

The reports submitted by Aptech showed both local and long distance calls, thereby enabling the County to identify the number of personal calls being made by the employees. In addition, these reports facilitated billing by providing the Controller's office with the proper apportionment of calls, thus permitting each department to be billed for the actual number of calls made. The testimony revealed that the services performed by Aptech were, indeed, specialized. The manager of the County's communication system testified that she contacted several computer companies to inquire as to whether they could perform the same service, none of which were even familiar with this type of service. Among those contacted was AT & T which also failed to be of any assistance in this matter. This computer program developed by Aptech for the collection and processing of this information belonged exclusively to Aptech. The fact that the services provided by Aptech did not include any recommendations, but, only information, does not render its services something other than "professional." These services required special skill, technology, and training. Thus, we conclude that the services rendered by Aptech constitute "professional services" under to 18 P.S. § 1802(h)(5) and, therefore, the contract entered into for such services is exempt from the bidding requirement. Accordingly, we affirm the dismissal of those surcharges imposed on the Commissioners as a result of their failure to bid this particular contract.

## III. SHERIFF'S PETTY CASH FUND

The final issue presented involves several surcharges levied against the Sheriff by the Controller in her Annual Financial Report for the year 1984. The surcharges at issue all relate to expenditures by the Sheriff or his deputies, the reimbursements for which were taken from the

Sheriff's Petty Cash fund.[7] The Controller levied the surcharges in question based upon the Sheriff's failure to provide documentation verifying these expenditures to the satisfaction of the Controller. The trial court dismissed some of these surcharges because it found certain testimony credible and sufficient to explain the expenditure.

The Controller argues that an incorrect standard of review was applied by the lower courts. It is her contention that she, alone, has the authority to require documentation in support of any questionable expenditures and that absent a finding that she abused that discretion, the trial court is without power to alter her decision. She cites the following portion of Section 1702(a) of the County Code, 16 P.S. § 1702, in support of her position:

> The discretionary powers of the Controller shall not be applicable to the management of the fiscal policies of the County Commissioners or to matters not involving the accounts and transactions of officers or other persons of the County, but the Controller shall refuse to authorize any fiscal transaction which is, by law, subject to his supervision or control where it appears that such transaction is not authorized by law ... or to which he desires upon reasonable grounds to investigate ... He may at any time require from any such officers, in writing, an account of all monies or property which may have come within their control.

16 P.S. § 1702(a). In effect, she is arguing that she alone may determine whether an expenditure is appropriate and

7. The Controller's Annual Financial Report for the year 1984 also included certain surcharges levied against the Sheriff which pertained to items originally paid for out of the Sheriff's petty cash fund in 1983. Apparently, those particular expenditures were not discovered until sometime in 1985 while the 1984 audit was being prepared. A 1983 audit of this petty cash fund was, however, timely performed and no surcharge had been imposed. The trial court found that the 1983 expenditures should have been discovered during the initial audit and, therefore, dismissed those particular surcharges on the basis that they were time barred. The Commonwealth Court affirmed. The Controller has not appealed those particular surcharges.

that the trial court has no power to make any such determination.

The Sheriff's petty cash fund contained approximately $500.00. The fund was used to reimburse the Sheriff and/or his deputies for expenses incurred in the performance of their official duties. At times, the funds were given in advance, prior to an expenditure. Any cash not spent would be returned to the fund along with receipts for any expenditures. The Sheriff's office periodically requested the Controller's Office to reimburse the fund. Receipts were submitted to the Controller who would then approve or disapprove the expenditure. The Controller, at all times relevant to this matter, does not dispute the fact that the Sheriff and his deputies were entitled to be reimbursed for expenses actually incurred in the performance of their duties. What she does question, however, is whether the funds were expended in the course of their official duties.

In dismissing the subject surcharges, the trial court reviewed the evidence presented and found that each of the items were either properly submitted to the Controller or subsequently verified as being expenses incurred in the performance of the Sheriff's or his deputies' official duties. The trial court was not limited, as the Controller argues, to her findings that the expenses were not sufficiently justified. To so hold would be ludicrous. The Controller's remedy where she finds that an expense is not justified to her satisfaction is to impose a surcharge which is exactly what she did here. The surcharged official then has a right to appeal from the surcharge to the Court of Common Pleas. 16 P.S. § 1731. Where there is then a factual dispute as to whether the expenditure was proper, the matter is properly placed before the trial court.

Here, the trial court found that the documentation provided by the Sheriff's office or the testimony presented was sufficient to verify that the expense in question was necessary and performed in the course of official duty. After reviewing the record, we cannot find that the trial court abused its discretion. Accordingly, we affirm the dismissal

of those surcharges against the Sheriff as amended by the trial court in its consideration of post-trial motions.

Accordingly, that portion of the Commonwealth Court's Order dismissing the surcharges imposed as a result of the Felice, Bedway, R.B.A., SAMS, and Aptech contracts and the Sheriff's petty cash fund is affirmed.

LARSEN, J., did not participate in the consideration or decision in this matter.