**COUNTY COUNCIL OF NORTHAMPTON COUNTY, Plaintiff,**

v.

**SHL SYSTEMHOUSE CORP., Defendant,**

v.

**Northampton County, Third Party Defendant.**

**Civil Action No. 98–0088.**

United States District Court, E.D. Pennsylvania.

Sept. 22, 1999.

Karl F. Longenbach, Bethlehem, PA, for Plaintiff.

Ronald P. Schiller, Joseph Kernen, Elizabeth J. Feeney, Piper & Marbury L.L.P., Philadelphia, PA, for Defendant SHL Systemhouse, Corp.

Daniel B. Huyett, Matthew W. Rappleye, Stevens & Lee, Reading, PA, for Third Party Defendant, Northampton County.

## MEMORANDUM AND ORDER

JOYNER, District Judge.

This is a breach of contract action brought by Plaintiff, County Council of Northampton County ("County Council") against Defendant, SHL Systemhouse Corporation ("Systemhouse") and expanded by Systemhouse to include its suit against Third Party Defendant, Northampton County ("County"). Presently before the court are Systemhouse's and the County's Cross–Motions for Partial Summary Judgment pursuant to Federal Rule 56 of Civil Procedure of the County's First, Second, Third, Sixth, Seventh and Eighth Counterclaims and Fifth, Sixth and Seventh Affirmative Defenses. Systemhouse also moves for summary judgment of the County's Eleventh Counterclaim. For the following reasons, Systemhouse's motion will be granted in part and denied in part and the County's motion will be denied.

## BACKGROUND

In January 1994 Dr. A. Landis Brackbill ("Dr.Brackbill") took office as County Executive of Northampton County having campaigned for the office on a promise to provide a county-wide 911 system. (County's Br.[1] Ex. A at 30–35). A task force was formed in 1994 to devise a plan for providing E9–1–1 services in Northampton County pursuant to Pennsylvania's Public Safety Emergency Telephone Act of 1990, Act No. 78, 1990 P.L. 340, as amended, 35 P.S. §§ 7011 *et seq.* ("Act 78").

During the first few months of 1995, vendors including Systemhouse made proposals to prepare a E9–1–1 plan that could be filed with the Commonwealth for Act 78 approval. On April 6, 1995 the County Council passed a resolution to approve Systemhouse's proposal to produce an E9–1–1 plan. (Systemhouse's Mem.[2] Ex. F at 9). On April 17, 1995 the County contracted with Systemhouse to design the county-wide E9–1–1 plan and to present it in a form suitable for Act 78 approval. (County's Br. Ex. O). At the County Council meeting on October 5, 1995 Dr. Brackbill stated that the implementation of the E9–1–1 plan required professional and specialized service and therefore permitted him, as County Executive, to contract with a vendor to provide this service. (Systemhouse's Mem. Ex. N at 4). On October 19, 1995 Systemhouse submitted its E9–1–1 plan to the County Council.

The E9–1–1 plan included a computer aided dispatch ("CAD") system with an associated database containing all County addresses. (Systemhouse's Mem. Ex. G § 3.2.2.3). When a member of the public placed a 911 emergency call, the CAD system was supposed to automatically display for the call taker information such as the caller's telephone number, name, address, and the appropriate dispatch point

---

1. "County's Br." hereinafter refers to "Third–Party Defendant Northampton County's Brief in Opposition to Defendant SHL Systemhouse Corporation's Motion for Partial Summary Judgment and in Support of Its Cross–Motion for Partial Summary Judgment."

2. "Systemhouse's Mem." hereinafter refers to "Memorandum of Law in Support of Defendant SHL Systemhouse Corp.'s Motion for Partial Summary Judgment."

of origin for various emergency services. The call taker would then confirm the origin and nature of the call, determine the nature of the emergency service required, and enter the required information into the CAD system for routing to a dispatcher. (Systemhouse's Mem. Ex. G § 3.2.2.). Finally, the dispatcher would effect the actual dispatch of the appropriate emergency service from an appropriate point of origin. (County's Br. Ex. B at 51–52). Under the E9–1–1 plan, the party implementing the plan would be primarily responsible for processing the initial telephone or radio call and hand it off to the responding agency. (County's Br. Ex. C, Volume II at 30). Other responsibilities included the generation and storage of information that could be used for evidentiary purposes in the event of criminal investigations. (County's Br. Ex. C, Volume II at 30).

On October 19, 1995 the County Council approved the E9–1–1 plan and authorized its submission to the Pennsylvania Department of Community Affairs for Act 78 approval. At this time, Systemhouse submitted a separate proposal to implement the E9–1–1 plan and Dr. Brackbill announced his intention to negotiate with Systemhouse a contract to implement the E9–1–1 plan. (Systemhouse Mem. Ex. I at 13). By letter dated October 19, 1995 Dr. Brackbill notified Systemhouse of the County's intent to move forward to negotiate with Systemhouse the terms of a "Professional Services Agreement . . . ." (Systemhouse's Mem. Ex. J).

Before the Services Agreement between Systemhouse and the County ("Agreement") was executed, County Solicitor Preston W. Moritz ("Moritz") gave Systemhouse a copy of a contract previously entered into by the County with Systems & Computer Technology Corporation ("SCT"). He discussed several times with Systemhouse personnel and attorneys the development of the Agreement. (Systemhouse's Mem. Ex. L). Systemhouse representatives and Moritz exchanged several drafts of the Agreement. (Systemhouse's Mem. Ex. K at 110–11, 114–21, 127–28). A final red-lined draft of the Agreement was approved by Moritz on December 11, 1995. (Systemhouse's Mem. Ex. K at 131–32).

County Council member, Diane V. Elliott ("Elliott") reviewed the Agreement several times before Brackbill signed it and was present at the signing of the Agreement. (Systemhouse's Mem. Ex. K at 213; County's Br. Ex. D at 198–202). The Agreement was entered into on December 12, 1995.

Pursuant to the Agreement, Systemhouse was duty-bound to "design, develop, operate, and support the infrastructure for the receipt and dispatch of emergency calls initiated throughout the County . . . in a centralized communications operation." (Agreement at A–1). Systemhouse's obligations included: 1) consolidating seven existing independent dispatch centers into one County communication center; 2) operating it; 3) implementing the E9–1–1 plan by incorporating in part Computer Aided Dispatch ("CAD"), Automatic Number Identification ("ANI") and Automatic Location Identification ("ALI"); and 4) maintaining the county wide public safety radio system. (Agreement at A–1).

The implementation of the E9–1–1 plan was to be accomplished in part by the incorporation of the CAD system. This system would "serve primarily as the heart of the County wide E911 answering center and emergency resource allocation system enabling Northampton County dispatchers to prioritize calls for service and allocate available law enforcement, fire, or EMS units based on incident/workload priorities provided by the County." (Agreement at A–2). More specifically, the CAD system would provide units responding to 911 calls with information about the location of the calls, the previous history of the location and the residents, and the existence of hazardous materials at the location. (Agreement at A–3).

In the spring of 1996 the County Council held three hearings for the purpose of reviewing the Agreement "line-by-line." (Systemhouse's Mem. Ex. K at 144–46).

On June 5, 1996 the entire County Council sent a letter to Dr. Brackbill to seek to renegotiate the Agreement. (Systemhouse's Mem. Ex. V). On April 18, 1996 the County Council refused to enact an ordinance levying the authorized Act 78 contribution rate of $1.25 per telephone line. (County's Br. Ex. J at 32–33). The County Council passed a resolution proposing an alternative E9–1–1 service plan that would require renegotiating the Agreement. (Systemhouse's Mem. Ex. W). Systemhouse agreed to renegotiate the Agreement. (Systemhouse's Mem. Ex. X).

After the changes requested by the County Council were made to the Agreement, the County Council voted 8–1 on August 1, 1996 to authorize the collection of a $1.25 fee from every County resident to help fund the Agreement. (Systemhouse's Mem. Supp. Mot. Partial Summ. J. Exs. Y, Z). Dr. Brackbill notified Systemhouse to proceed with the implementation of the E9–1–1 plan. (Systemhouse's Mem. Supp. Mot. Partial Summ. J. Ex. AA). He and three members of the County Council, Diane V. Elliott, Wayne Grube and Margaret Ferraro signed the formal written instruction for Systemhouse to begin the implementation of the E9–1–1 plan.

On August 15, 1996 the County Council unanimously passed a resolution to introduce an ordinance amending the County's Administrative Code. (County's Br. Ex. L. at 4–8). On September 5, 1996 the County Council unanimously voted to adopt the ordinance. (County's Br. Ex. M). The amendments to the County's Administrative Code included the addition of sections 13.10(c)(2)(b) and 13.10(c)(5)(a). (County's Br. Ex. M at 4–8). Section 13.10(c)(2)(b) provides that:

> All contracts shall contain an express written provision which clearly provides that in the event of non-appropriation of funds, at any time during the term of the contract, which would prevent the County from making payment under the terms and conditions of the contract, the County may terminate the contract, without the assessment of any termination charges or financial penalties against the County, by providing written notice of intent to terminate to the contracting party. Said provision shall also state that if the County terminates a contract due to the non-appropriation of funds, the County will pay the contractor for work currently in progress, and that the vendor shall not begin any additional work on the effected contract upon receipt of notification of intent to terminate by the County.

(County's Br. Ex. M at 8). Section 13.10(c)(5)(a) states that:

> Before the County Executive signs any prospective contract, obligating the County to any of the provisions contained therein, the County Executive shall provide written notification to County Council of the contract if the contract consideration exceeds $200,000, regardless of whether the contract term spans more that [sic] one fiscal year or exceeds twelve months.

(County's Br. Ex. M at 4–8).

Schedule D of the Agreement stated in pertinent part that it "will be amended to include a schedule for the Early Termination Charges described in Section 9 after the financing has been obtained." (Agreement, Schedule D at D–4). In November 1996 Systemhouse sent Dr. Brackbill a proposed Early Termination Charge schedule pursuant to Schedule D of the Agreement. Dr. Brackbill approved of the schedule.

On November 4, 1997, Dr. Brackbill lost his bid for reelection to Glenn Reibman who until then had been the President of the County Council. On December 31, 1997 the County Council filed suit against Systemhouse in the Court of Common Pleas of Northampton County. Systemhouse removed the case to federal court on January 8, 1998 and filed a third party complaint against the County on January 16, 1998. On March 6, 1998 the County filed its Answer and New Matter, asserting the counterclaims and affirmative defenses which are now the subject of Sys-

temhouse's motion for partial summary judgment and the County's cross-motion for partial summary judgment.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, reveal no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Our responsibility is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The presence of "a mere scintilla of evidence" in the nonmovant's favor will not avoid summary judgment. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir.1989)(citing *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505). Rather, we will grant summary judgment unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

In making this determination, all of the facts must be viewed in the light most favorable to the non-moving party and all reasonable inferences must be drawn in favor of the non-moving party. *Id.* at 256, 106 S.Ct. 2505. Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the non-moving party must establish the existence of each element of its case. *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir.1990)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The nonmovant must go beyond the pleadings and come forward with "specific facts, by affidavits, depositions, answers to interrogatories or admissions on file showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c)).

If there is a "disagreement about material facts or the conflicting inferences to be drawn from them, a trial is required to resolve the conflicting versions." *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir.1982). "The court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version." *In re Bell Atlantic Corp. Securities Litigation*, Nos. 91–0514, 91–0673, 93–999, 91–0518, 91–0737, 91–0531, 91–7048, 1997 WL 205709 at *2 (E.D.Pa. April 17, 1997) (citing *McDaniels v. Flick*, 59 F.3d 446, 453 (3d Cir.1995)).

### II. County Executive's Contracting Authority

Systemhouse and the County move for summary judgment of the allegations that Dr. Brackbill lacked the authority to contract with Systemhouse (County's First Counterclaim and Sixth Affirmative Defense). The County's bases for its argument that Dr. Brackbill acted without authority in contracting with Systemhouse include: 1) the Agreement was not a contract for professional services, 2) Dr. Brackbill did not follow the procedures for professional service contracts and 3) the Agreement improperly called for the performance of an essential governmental function.

### A. Professional Service Contract

■ The first issue is whether the Agreement was a contract for professional services. County contracts, in general, are required to be awarded by competitive bidding. (County's Admin. Code § 13.04). Contracts for "professional services," however, are exempted from the competitive bidding requirement. (County's Admin. Code § 13.03(b)(6)). The County Executive has authority to contract for professional services. (County's Admin. Code § 13.07(a)). The Code does not define "professional services," but it does provide the following list of examples: "architectural, construction, data processing, engineering, financial, financially related and maintenance services; the services of

members of the medical or legal profession; certified public accountants, or other personal services involving professional expert advice." (County's Admin. Code § 13.03(b)(6)).

To establish guidelines for defining professional service exemptions to public contract bidding for all instances where competitive bidding is required, the Pennsylvania Supreme Court in *In re 1983 Audit Report of Belcastro*, 528 Pa. 29, 595 A.2d 15, 20–21 (1991) defined "other personal services involving professional expert advice" to include "such services which involve quality as the paramount concern and require a recognized professional and special expertise." *Belcastro*, 595 A.2d at 20–21. "[W]here quality is of little concern, perhaps because the product or service varies little from company to company, competitive bidding should be required." *Id.* It should not be required "where quality of the service is the paramount concern[.]" *Id.* In determining whether a public contract is one for professional service and, therefore, exempt from the competitive bidding requirement, the court should remain mindful of the underlying public policy rationale for competitive bidding—to guard against favoritism, improvidence, fraud, and corruption in the awarding of public contracts. *See Id.*

In *Belcastro*, two contracts were found to be professional service agreements and, thus, exempt from competitive bidding. For the first contract, college graduates with expertise in testing and counseling were employed to test and evaluate individuals for characteristics as intelligence, educational skills, and physical ability to create profiles in an effort to find the individuals suitable training and/or employment. *See Id.* at 21. The second contract involved the purchase of data processing software and equipment that required the submission of monthly reports to the County which included information such as the cost, the department making the phone call, and the trunk line that was used. *See Id.* at 21. With these reports, the County could monitor the telephone lines of the various county departments and identify the number of personal calls being made by the employees and permitted each department to be billed for the actual number of calls made. *See Id.* at 21–22.

Like the two contracts in *Belcastro*, the Agreement required special skill, technology and training. Systemhouse was duty-bound to "design, develop, operate, and support the infrastructure for the receipt and dispatch of emergency calls initiated throughout the County ... in a centralized communications operation." (Agreement at A–1). Systemhouse's obligations included: 1) consolidating seven existing independent dispatch centers into one County communication center; 2) operating it; 3) implementing the E9–1–1 plan by incorporating in part Computer Aided Dispatch ("CAD"), Automatic Number Identification ("ANI") and Automatic Location Identification ("ALI"); and 4) maintaining the county wide public safety radio system. (Agreement at A–1).

The implementation of the E9–1–1 plan was to be accomplished in part by the incorporation of the CAD system. This system would "serve primarily as the heart of the County wide E911 answering center and emergency resource allocation system enabling Northampton County dispatchers to prioritize calls for service and allocate available law enforcement, fire, or EMS units based on incident/workload priorities provided by the County." (Agreement at A–2). More specifically, the CAD system would provide units responding to 911 calls with information about the location of the calls, the previous history of the location and the residents, and the existence of hazardous materials at the location. (Agreement at A–3). The implementation of a plan that includes a system as sophisticated as the CAD system clearly requires specialized business and technical judgment and professional skill.

The County, nevertheless, argues that the Agreement requires the mere physical implementation of the E9–1–1 plan and

implies that any number of appropriately qualified companies could implement the plan. The County contends that the only services Systemhouse provided which might qualify as "professional" were provided in Systemhouse's performance of the April 1995 Contract which spelled out the E9–1–1 plan. Although it is true that the Agreement required the physical implementation of generic products like telephones, the characterization of the entire Agreement as requiring a mere physical implementation is dubious. As previously mentioned, the Agreement requires that Systemhouse "design, develop, operate, and support the infrastructure for the receipt and dispatch of emergency calls initiated throughout the County ... in a centralized communications operation." (Agreement at A–1). The County does not show that the E9–1–1 plan with the CAD system is readily capable of being implemented by any other vendors. The Agreement is focused less on the provision of property like telephones and radios and more on Systemhouse's use of this property to provide comprehensive county wide E9–1–1 services. These duties are not of the nature that quality is of little concern.

The County also argues that Systemhouse's contractual right under the Agreement to delegate performance of any of its duties, obligations and responsibilities to any of Systemhouse's affiliates or to any Systemhouse-selected independent contractor purportedly shows that quality was not required as being of paramount concern. Systemhouse's right to subcontract does not evidence that quality was not of paramount concern in the Agreement because the right did not relieve System-

house "of any of its duties, obligations or responsibilities...." (Agreement at E–16).

The County analogizes the instant case to the Pennsylvania Supreme Court decision in *In re 1985 Washington County Annual Financial Report Surcharge,* 529 Pa. 81, 601 A.2d 1223, 1224–26 (1992) in which an agreement for the installation of an integrated management information system and the relocation of the existing system to a home facility was found to be not exempt from competitive bidding. The *Washington County* decision is inapposite since it dealt not with the applicability of the professional service exemption but that of the exemption for patented and manufactured or copyrighted products. Therefore, the Agreement is a professional service contract.[3]

### B. *Compliance with Procedures*

Whether Dr. Brackbill complied with the procedures for professional service contracts is the second issue in determining if Dr. Brackbill contracted without authority. The County claims that Dr. Brackbill failed to satisfy the procedures of Section 13.07(b)(2) of the County's Administrative Code. Section 13.07(b)(2) of the Administrative Code provides as follows:

No ... agreement for professional services ... shall be entered into by the County Executive, the Northampton County Council, or any other independently elected official, without:

(a) giving written notification to the Office of the County Council; and

(b) receiving the approval of the agreement by County Council resolution, if the contract involves the reten-

---

3. Since the Agreement is a professional service agreement, the court does not need to determine whether Brackbill satisfied Subsections (b) and (d) of § 13.04 of the Administrative Code to otherwise avoid the competitive bidding requirement. Section 13.04(b) of the Administrative Code provides that "[p]rocurement and disposition of County property shall be by competitive sealed bidding, the County Executive shall, by Executive Order, determine that this method is not practical and

state therein the specific reasons to County Council for that determination." (County's Admin. Code § 13.04(b)). Section 13.04(d) provides that "[a] contract may be awarded by noncompetitive negotiation when the County Executive determines that competition is not in the best interest of the County." (County's Admin. Code § 13.04(d)). The County's Seventh Counterclaim dealt with these sections and therefore shall be dismissed.

tion of professionals pursuant to the authority of the Council under Section 202 of the Home Rule Charter to incur indebtedness ... and acquire property. (Admin.Code 13.07(b)(2)). Dr. Brackbill failed to give written notice to the County Council or receive approval of the Agreement by County Council resolution before executing the Agreement. Systemhouse, however, argues that since the County had notice and passed a resolution authorizing funding for the Agreement after Dr. Brackbill signed it, Brackbill complied with the requisite procedure.

■ The County contends that Dr. Brackbill's failure to give the County Council written notice and to seek a County Council resolution approving of the Agreement before he signed it violated the procedures mandated under Section 13.07(b)(2). Brackbill's noncompliance with these procedures allegedly voided the Agreement. The County argues that a failure to comply with the procedures for professional service contracts is fatal because a failure to follow the procedures for competitively bid contracts is fatal. *See, e.g., Belcastro,* 595 A.2d at 21; *Albert Gallatin Area School Dist. v. Penn Transp. Services, Inc.,* 704 A.2d 184, 185–86 (1997); *Philadelphia Warehousing & Cold Storage v. Hallowell,* 88 Pa.Cmwlth. 574, 490 A.2d 955, 956–57 (1985).

The instant case, however, is distinguishable from these cases precisely because it involves a professional service contract and not a competitively bid one. In light of the sound policy reasons for competitive bidding which include guarding the public against favoritism, improvidence, extravagance, fraud and corruption, *see Belcastro,* 595 A.2d at 21; *Philadelphia Warehousing,* 490 A.2d at 956–57, it makes sense to strictly enforce the procedural requirements for competitive bidding. It does not follow that the same strictness should be applied to the procedural requirements for the professional services exemption to competitive bidding. After all, contracts for professional service involve the arms-length negotiations pres-

ent in everyday contracting. Such negotiations are anathemas to competitive bidding.

The County aptly stated that these requirements "were specifically designed to prevent ... the award of an expensive ... contract without the oversight, input, or approval of County Council." (County's Br. at 45). It therefore would seem fair to say that the procedural requirements of Section 13.07(b)(2) are satisfied so long as the County Council had oversight, input and approval of the Agreement. The record indicates that the County Council did have oversight, input and approval of the Agreement. The County Council certainly had notice of Dr. Brackbill's negotiations with Systemhouse. As early as October 5, 1995, Brackbill announced to the County Council that "if he determine[d] that the SHL plan was satisfactory, he could sign a contract for them to provide 911 service in Northampton County." (County Council October 5, 1995 Minutes at 4). On October 19, 1995 Dr. Brackbill told members of the County Council that he would be negotiating with Systemhouse.

Moreover, on October 19, 1995 the County Council received and reviewed the E9–1–1 plan. It expressly stated that the E9–1–1 services would be provided over a ten year period at a cost of $47 million and "[i]t is the stated intent of the County to establish a contractual association with the SHL Systemhouse which will provide enhanced 9–1–1 service to all residents of Northampton County." (Systemhouse's Mem. Ex. G, Executive Summary). At the County Council meeting of October 19, 1995 Systemhouse representatives stated that Systemhouse wanted to implement the E9–1–1 plan. Additionally, County Council member, Diane V. Elliott reviewed drafts of the Agreement and the Agreement itself before witnessing the signing of the Agreement by Dr. Brackbill on December 12, 1995.

On the day after Brackbill signed the Agreement, County Council members discussed at great lengths his execution of

the Agreement. (Systemhouse's Reply Br.[4] Ex. 19). They expressly acknowledged that County Council Solicitor Karl Longenbach had received a copy of the Agreement. (Systemhouse's Reply Br. Ex. 19). In the spring of 1996 the County Council held three hearings for the purpose of reviewing the Agreement "line-by-line." (Systemhouse's Mem. Ex. K at 144–46). On June 5, 1996 the entire County Council sent a letter to Dr. Brackbill to seek to renegotiate the Agreement. (Systemhouse's Mem. Ex. V). After the changes requested by the County Council were made to the Agreement, the County Council voted 8–1 on August 1, 1996 to authorize the collection of a $1.25 fee from every County resident to help fund the Agreement. (Systemhouse's Mem. Supp. Mot. Partial Summ. J. Exs. Y, Z). Dr. Brackbill notified Systemhouse to proceed with the implementation of the E9–1–1 plan. (Systemhouse's Mem. Supp. Mot. Partial Summ. J. Ex. AA). He and three members of the County Council, Diane V. Elliott, Wayne Grube and Margaret Ferraro signed the formal written instruction for Systemhouse to begin the implementation of the E9–1–1 plan. The record plainly indicates that the County Council had oversight, input and approval of the Agreement. Therefore, there is no genuine issue of material fact that the procedures for professional service contracts were satisfied.

### C. Governmental versus Proprietary Functions

■ The third issue in determining if Dr. Brackbill lacked the authority to contract the Agreement is whether it called for the performance of an essential governmental function. In Pennsylvania, if a governmental official or entity purports to commit its successors in office to a long-term agreement which binds those successors in the exercise of a "governmental" as opposed to a "proprietary" function, the agreement is wholly invalid and unenforceable. *See State Street Bank & Trust Co. v. Commonwealth,* 712 A.2d 811, 815 (1998) ("It is a mistake to suppose that, because a public official ... has power to make a contract, he is authorized thereby to make one for an indefinite or long extended term"); *County of Butler v. Local 585,* 158 Pa.Cmwlth. 519, 631 A.2d 1389, 1392 (1993) (stating that contract purported to bind successor governments in performance of governmental functions is "void and unenforceable in its entirety"); *Falls Township v. McManamon,* 113 Pa.Cmwlth. 504, 537 A.2d 946, 947–48 (1988) (providing that contract purported to bind successor municipal government in exercise of governmental functions void as against public policy).

■ In general, proprietary functions have been characterized as those that a legislative board is not statutorily required to perform, may be carried on by private enterprise or are undertaken as a means to raise revenue. *See County of Butler,* 631 A.2d at 1392–93. On the other hand, governmental functions include those that a legislative board is statutorily entrusted with performing, are indispensable to the proper functioning of government and, because they implicate the policy making function, demand that current officeholders be able to control, free of restrictions imposed by predecessors. *See State Street,* 712 A.2d at 813–14. The *State Street* court rejected the factors enumerated in *County of Butler* in the context of government contracts that involve the statutory powers of an officer of the executive branch of the state government but did not in the context of government contracts at the local government level. *See State Street,* 712 A.2d at 813–14 n. 9; *but see Lobolito, Inc. v. North Pocono School District,* 722 A.2d 249, 252–53 n. 5 (1998) (noting that *County of Butler* factors were rejected in *State Street* without recognizing that *State Street* court differentiated

---

4. "Systemhouse's Reply Br." hereinafter refers to "SHL Systemhouse Corp.'s Reply Brief in Support of its Motion for Partial Summary Judgment and in Opposition to Northampton County's Cross–Motion for Partial Summary Judgment."

government contracts that involve statutory powers of officer of executive branch of state government from government contracts at the local government level). In any case, the essential inquiry is whether the enforcement of the contract would impair, to any significant degree, the new body's exercise of its policy making role. *See Lobolito,* 722 A.2d at 252–53.

■ In *County of Butler,* Butler County sued to void a contract entered into between the previous board of county commissioners and the private operator of a minimum security rehabilitation center. Butler County alleged that the contract required the performance of a governmental function as opposed to a proprietary function so that the previous board could not act to bind the successive board. Relying in large part on the fact that the County was under no statutory obligation to operate a drug and alcohol treatment facility, the *County of Butler* court upheld the prior board's award of the contract as the fulfillment of a proprietary and not an essential governmental function.

Similarly, although Act 78 encourages each county to adopt a 9–1–1 plan, Act 78 does not require the county to be the actual party implementing the plan. There is, therefore, no legislative or constitutional command that a specified government official must perform the services. Act 78 permits such services to be provided by private entities. The County opted to adopt a county-wide E9–1–1 plan. If the plan was Act 78 approved, the County then only had statutory authority to levy a surcharge on all telephone lines. This authority does not translate into a statutory requirement to implement a E9–1–1 plan.

The County, however, contends that the performance of governmental functions is required under the Agreement because the E9–1–1 services to be provided fall under the police power of the County and its political subdivisions to provide for the public health, safety and welfare. Several courts have determined that provision of emergency ambulance or medical services is a governmental function for the purposes of sovereign, governmental or statutory immunity. *See, e.g., Overman v. Occoquan, Woodbridge, Lorton Volunteer Fire Dept., Inc.,* 948 F.2d 1282, 1991 U.S.App.LEXIS 28678 at *5–8 (4th Cir. 1991); *Poole v. Inlow,* 80 Ohio App.3d 379, 609 N.E.2d 238, 239–40 (1992); *Pawlak v. Redox Corp.,* 182 Mich.App. 758, 453 N.W.2d 304, 307 (1990); *Edwards v. City of Portsmouth,* 237 Va. 167, 375 S.E.2d 747, 749 (1989); *Saathoff v. City of San Diego,* 35 Cal.App.4th 697, 706, 41 Cal. Rptr.2d 352 (1995); *Brunton v. Porter Memorial Hosp. Ambulance Service,* 647 N.E.2d 636, 639–40 (1994). Although providing emergency ambulance or medical services may be indispensable to the proper functioning of government, providing services to "design, develop, operate, and support the infrastructure for the receipt and dispatch of emergency calls initiated throughout the County . . . in a centralized communications operation[,]" is not. (Agreement at A–1). The collection and transmission of specific information on the residences from which telephone calls are made to personnel in route to the residences in a relatively short period of time are functions not performed by a governmental body that a private party would perform for generating profits.

Therefore, the enforcement of the Agreement will not impair the governing body's exercise of policy-making role. The court notes that it seems a bit disingenuous of the County to contend as much. The relevant governing body here is the County Executive. The record indicates that the present County Executive, Reibman voted to authorize funds for the Agreement when he was County Council president in 1996. In light of this implicit approval of the Agreement, his policy-making role certainly has not been hindered in any way.

*III. Separation of Powers*

■ The parties also move for summary judgment of the Second Counterclaim and Sixth Affirmative Defense in which the

County alleges the Agreement is void due to Dr. Brackbill's alleged invasion of the legislative province of the County Council. Dr. Brackbill purportedly committed this invasion by binding the County to a long-term contract implicating the police power and requiring significant and increasing budget appropriations over a ten year period. The County's Administrative Code, however, did not limit the County Executive's power to contract at the time of the Agreement's execution. Nevertheless, the County cites to the decision of *Shapp v. Sloan*, 480 Pa. 449, 391 A.2d 595, 604–05 (1978) for the precedential authority to void the Agreement based on this separation of powers argument. The Pennsylvania Supreme Court in *Shapp* interpreted Article 3, Section 24 of the Pennsylvania Constitution [5] to mean that officials in the executive branch of state government may not expend funds specifically appropriated by the state legislature for one purpose to carry out another program. *See Shapp*, 480 Pa. 449, 391 A.2d 595, 604–05 (1978). The County fails to show how the instant case is in any way analogous to the *Shapp* decision. It is astonishing that the County would make such an argument when the record plainly indicates that the legislative branch of the County, the County Council had notice of Dr. Brackbill's actions and even decided to approve the funding for the Agreement.

5. Article 3, Section 24 of the Pennsylvania Constitution provides that "[n]o money shall be paid out of the treasury, except on appropriations made by law and on warrant issued by the proper officers; . . . ."

6. Section 13.10(c)(2)(b) provides that:

All contracts shall contain an express written provision which clearly provides that in the event of non-appropriation of funds, at any time during the term of the contract, which would prevent the County from making payment under the terms and conditions of the contract, the County may terminate the contract, without the assessment of any termination charges or financial penalties against the County, by providing written notice of intent to terminate to the contracting party.
(County's Admin. Code § 13.10(c)(2)(b)).

## IV. Amended Schedule D

■ Both parties move for summary judgment of the portions of the Third and Eighth Counterclaims that include allegations of Dr. Brackbill's failure to follow procedures in approving the Early Termination Charge of Amended Schedule D in November 1996. The parties apparently agree that if a new contractual obligation was created by Dr. Brackbill's approval, sections 13.10(c)(2)(b) [6], 13.10(c)(5)(a) [7] and 13.10(a) [8] of the Administrative Code would have needed to have been satisfied. Dr. Brackbill was not in compliance with these sections. The record reveals sufficient factual disputes as to whether a new contractual obligation was created here to warrant the denial of both parties' motions for summary judgment.

## V. Contingency Clause

■ Systemhouse and the County move for summary judgment of the portion of the Third Counterclaim that alleges the Agreement is void because it lacks a required contingency clause concerning non-appropriation of County funds. Section 13.10(c)(2)(a) of the County Administrative Code provides that "[e]very contract shall specifically state that it is contingent upon the availability of appropriated funds from which payment can be made." Systemhouse argues that Section 7.2 of the Agreement is proof of compliance with

7. Section 13.10(c)(5)(a) states that:

Before the County Executive signs any prospective contract, obligating the County to any of the provisions contained therein, the County Executive shall provide written notification to County Council of the contract if the contract consideration exceeds $200,-000, regardless of whether the contract term spans more that[sic] one fiscal year or exceeds twelve months.
(County's Admin. Code § 13.10(c)(5)(a)).

8. Section 13.10(a) states that "[a]ll contracts and agreements shall be prepared and executed by the Director of the ordering department as directed by the County Executive by way of the Executive Order. All contract formats shall be approved by the County Solicitor prior to use." (County's Admin. Code § 13.10(a)).

§ 13.10(c)(2)(a). Section 7.2 of the Agreement provides in pertinent part that:

> In the event no funds or insufficient funds are appropriated and budgeted, the Customer will immediately notify SHL of such occurrence, and SHL and Customer will negotiate in good faith to amend this Agreement by: (a) reducing staffing and level of services in proportion to the amount so budgeted at the same gross profit percentage, and (b) preparing a revised scope of Services (Schedule A), and a revised Pricing Schedule (Exhibit D), to replace Exhibit A and Exhibit D of this Agreement. If SHL and Customer do not mutually agree to amend this Agreement, after good faith negotiation as stated above, then SHL shall have the right to terminate this Agreement for convenience, within thirty (60)[sic] days notice of such occurrence as stated above. In the event of such termination, SHL shall be obligated to provide Transition Assistance and the County shall be obligated to pay to SHL the Early Termination charge specified in Schedule D in addition to any other amounts due under this Agreement.

(Agreement § 7.2). The County contends that this provision does not comply with Section 13.10(c)(2)(a) because the County's duty to pay the Early Termination Charge in Schedule D in the event good faith negotiations to amend the Agreement fail is an improper qualification of this section of the Code which was designed to protect the public.

Section 7.2 of the Agreement certainly addresses Section 13.10(c)(2)(a) of the Administrative Code. Although Section 7.2 does not mirror the language of Section 13.10(c)(2)(a), it is clear that Section 13.10(c)(2)(a) does not bar the purported qualification. The County fails to show how the absence of a contingency clause that tracks the language of Section 13.10(c)(2)(a) voids the Agreement. In addition, the County never explained from what this section is protecting the public.

## VI. Illusory Promise

Both parties move for summary judgment of the allegations that the Agreement imposed only illusory obligations on Systemhouse (Sixth Counterclaim and Fifth Affirmative Defense). Where the promise in a contract is merely optional with the promisor, it is illusory and unenforceable. *See Geisinger Clinic v. Di Cuccio,* 414 Pa.Super. 85, 606 A.2d 509, 512 (1992), *appeal denied,* 536 Pa. 625, 637 A.2d 285 (1993). Claimed by the County as examples of illusoriness in the Agreement are the following: (1) the "performance standards and service levels" prescribed by Schedule B of the Agreement—the purportedly only quality control criteria included in the contract—are rendered meaningless by the provision at Section 9.1 that the failure to achieve those service levels is not a material breach of the contract; and (2) Systemhouse's total potential liability under the $47 million contract is limited to a mere $500,000 by Section 6 of Schedule E.

Even a casual glance at the Agreement reveals the many obligations that it places on Systemhouse. For example, Section 3.3 of the Agreement alone provides that "[Systemhouse]" shall use commercially reasonable efforts to ensure that its performance of the Services will meet or exceed the applicable Service Levels described in Schedule B. (Agreement § 3.3). Additionally, the County's examples fail to evidence illusoriness. Section 9.1(b)(iii) of the Agreement states that "[f]or the purposes of this Section 9.1, [Systemhouse] shall be deemed not to have materially breached or defaulted its material obligations hereunder if ... the breach or default consisted of failure to meet Service Levels." (Agreement § 9.1(b)(iii)). As Section 3.3 of the Agreement shows, the performance standards and service levels of Schedule B are not rendered meaningless because promises to use commercially reasonable standards to meet certain standards are not illusory. *See, e.g., Jamison v. Concepts Plus, Inc.,* 380 Pa.Super. 431,

552 A.2d 265, 269–70 (1988) (recognizing an implied duty to use best efforts to satisfy condition to contract). Additionally, limitation of liability clauses have been routinely upheld in Pennsylvania. *See Valhal Corp. v. Sullivan Associates,, Inc.,* 44 F.3d 195, 203 (3d Cir.1995). Moreover, the County has failed to show that the mere disparity between the amount of the limitation of liability clause and the value of the Agreement warrants voiding the entire Agreement or even just the clause itself.

## VII.   *Unjust Enrichment*

■ Systemhouse also moves for summary judgment of the Eleventh Counterclaim arguing that the doctrine of unjust enrichment does not apply if the Agreement is found to be valid. "Under Pennsylvania law, the quasi-contractual doctrine of unjust enrichment is inapplicable when the relationship between the parties is founded on a written agreement or express contract." *Hershey Foods Corp. v. Ralph Chapek, Inc.,* 828 F.2d 989, 999 (3d Cir. 1987). Since the relationship between Systemhouse and the County is founded on a valid written agreement, this doctrine indeed is inapplicable.

## CONCLUSION

An appropriate Order follows.[9]

## ORDER

AND NOW, this 22nd day of September, 1999, upon consideration of the Motions of Defendant, SHL Systemhouse Corp. ("Systemhouse") and Third Party Defendant, Northampton County ("County") for Partial Summary Judgment and their responses thereto as well as their many supplemental responses, it is hereby ORDERED that Systemhouse's Motion is GRANTED in part and DENIED in part and the County's Motion is DENIED. It is further ORDERED that:

1.  Systemhouse's Motion is GRANTED as to the County's First Counterclaim and Sixth Affirmative Defense and the County's First Counterclaim and Sixth Affirmative Defense are hereby DISMISSED WITH PREJUDICE.

2.  Systemhouse's Motion is GRANTED as to the County's Second Counterclaim and the County's Second Counterclaim is hereby DISMISSED WITH PREJUDICE.

3.  Systemhouse's Motion is DENIED as to the portions of the County's Third and Eighth Counterclaims that allege the consequences for Dr. Brackbill's failure to follow procedures in approving the Early Termination Charge of Amended Schedule D.

4.  Systemhouse's Motion is GRANTED as to the portions of the County's Third Counterclaim that alleges the Agreement is void because it lacks a contingency clause pursuant to Section 13.10(c)(2)(a) of the County's Administrative Code and these portions of the County's Third Counterclaim are DISMISSED WITH PREJUDICE.

5.  Systemhouse's Motion is GRANTED as to the County's Seventh Counterclaim and the County's Seventh Counterclaim is hereby DISMISSED WITH PREJUDICE.

6.  Systemhouse's Motion is GRANTED as to the County's Sixth Counterclaim and Fifth Affirmative Defense and the County's Sixth Counterclaim and Fifth Affirmative Defense are hereby DISMISSED WITH PREJUDICE.

7.  Systemhouse's Motion is GRANTED as to the County's Eleventh Counterclaim and the County's Eleventh Counterclaim is hereby DISMISSED WITH PREJUDICE.

**9.**   Systemhouse also moved for summary judgment alleging that a contractually imposed one year statute of limitations for bringing claims of contract formation improprieties has passed and the County is equitably estopped from raising issues on contract formation. The court will not consider these bases for Systemhouse's motion since the Agreement is found to be valid.

8. Systemhouse's Motion is GRANTED as to the County's Seventh Affirmative Defense and the County's Seventh Affirmative Defense is hereby DISMISSED WITH PREJUDICE.